In re VEE VINHNEE, Debtor.

American Express Travel Related
Services Company, Inc.,
Appellant,

v.

Vee Vinhnee, Appellee.

BAP No. CC–04–1284–KMOP.
Bankruptcy No. LA 03–29549–SB.
Adversary No. LA 03–02660–SB.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted Jan. 20, 2005.

Filed Dec. 16, 2005.

439

Dennis Winters, Santa Ana, CA, for American Express Travel Related Services.

Vee Vinhnee, Long Beach, CA, pro se appellee.

Before: KLEIN, MONTALI, and PERRIS, Bankruptcy Judges.

## OPINION

KLEIN, Bankruptcy Judge.

This appeal involves the elements of the evidentiary foundation for introducing electronic business records and whether a trial court is entitled to insist upon a complete foundation, even in the absence of an objection.

The court declined to admit plaintiff's computerized business records as inadequately authenticated at a bench trial, but gave plaintiff a chance to cure the foundational defects in a post-trial submission. When the ensuing submission proved unsatisfactory to the court, it entered judgment for defendant and added salt to the wound by noting that plaintiff would have prevailed on one of two counts if the records had been admitted.

While the result may seem harsh, we hold that the court was within its rights to insist, even in the absence of an objection, that all elements of a proper evidentiary foundation be correctly established. Under the circumstances, including the extra post-trial opportunity to cure the defect, we cannot say that the court abused its discretion. Hence, we AFFIRM.

### FACTS

Vee Vinhnee filed a chapter 7 bankruptcy case on July 24, 2003. His 2003 income through the date of filing was $14,800, and he earned $24,000/year in 2001 and 2002.

He had no secured debt. Priority tax debt was $33,861.14, dating back to 1992.

American Express was owed more than 80 percent of the unsecured debt based on two credit cards: a "gold" card (with two sub-accounts) issued in 1989 and a "platinum" card issued in February 2003. The gold card had an additional user, Kim A. Ly.

Vinhnee scheduled both American Express cards with correct account numbers. The $21,098.00 listed as owed on the platinum card was the balance due per his June 2003 statement. The sum listed as owed on the gold card, $3,245.00, was the minimum payment due on the June 2003 statement and not the full balance of $25,-485.92[1] due on the two gold card sub-accounts.

The gold card sub-account that required payment in full each month was current until May 2003. The $2,825.47 balance for that sub-account on the June statement reflected charges made April 3 to May 6, 2003, of which Kim A. Ly had charged $204.47.

The $23,377.43 owed on the gold card "flexible payment" sub-account, which was a typical credit card account at interest and with minimum payments, reflected charges made primarily between January and May 4, 2003, of which Kim A. Ly had charged $1,783.97. Vinhnee paid more than the monthly minimums in February and March 2003 and made a minimum payment in April 2003.

The debt on the platinum card that was issued in February 2003, was based on $21,115.24 charged during the period April 5–18, 2003, and was $21,728.87 as of July 24, 2003.

Vinhnee had stopped charging on American Express accounts by May 7, 2003. Kim A. Ly was deleted from the gold card account on May 10. Vinhnee filed his bankruptcy case on July 24, 2003.

American Express filed a two-count adversary proceeding seeking to have $41,597.63 of the debt excepted from discharge under 11 U.S.C. § 523(a)(2)(A). Implicitly conceding that $5,617.16 of the $25,485.92 gold card balance is dischargeable, one count sought to except only the remaining $19,868.76 from discharge. The other count sought to have the full platinum card balance, $21,728.87, held nondischargeable.

The court held a status conference on December 23, 2003, at which it fixed a trial date, noting that, if Vinhnee did not appear, it would exercise its discretion to require the plaintiff to adduce evidence to prove its case.

Vinhnee's default was entered at American Express' request on February 11, 2004. No motion for default judgment was filed.

Trial was held on March 25, 2004. American Express appeared and was prepared for trial. Vinhnee did not appear. The court, without objection by American Express, proceeded with the trial consistent with its prior announcement that it would require proof of entitlement to the relief requested.

An American Express employee testified that he was the custodian of records for the monthly statements, that the entries thereon were made at or about the time of the transactions, that the records were kept in the regular course of business, and that the regular practice was to retain the records.

---

1. Our description of the account charges is not based on findings of fact. Because the billing records were not admitted, they merely constitute an offer of proof. Fed.R.Evid. 103(b).

The witness, in response to the court's inquiry, testified that the term "duplicate copy" appeared on the exhibits because the records were maintained electronically.

The court then explained that the electronic nature of the records necessitated, in addition to the basic foundation for a business record, an additional authentication foundation regarding the computer and software utilized in order to assure the continuing accuracy of the records.

When the witness knew little about the computer software or hardware, the court deferred ruling on the admission of the exhibits. Offering American Express an opportunity to cure the foundational defect later, and calling counsel's attention to an evidence treatise on point, it completed the rest of the trial.

At the close of trial, the court held the evidentiary record open so that American Express could supplement its foundation for admission of the computer records.

Once American Express made its post-trial submission and the evidentiary record closed, the court rendered written findings.

The court refused to admit the electronic business records because it concluded that the defective evidentiary foundation was not cured by the supplemental materials. The declaration did not establish the declarant's qualifications to testify. Nor did the court perceive testimony that the business conducts its operations in reliance upon the accuracy of the computer in the retention and retrieval of the information in question.

The refusal to admit the billing statements in evidence left American Express with only Vinhnee's admissions on his schedules as evidence. He had admitted to a gold card debt of only $3,245.00, which was less than the $5,617.16 American Express conceded was discharged. His admission to a platinum card debt of $21,098.00 did not reveal the dates or nature of specific charges.

The court declined to except the gold card debt from discharge. It added, however, that "[i]f the account evidence were properly before the court," it would hold nondischargeable all charges on the flexible payment sub-account made after February 1, 2003. Thus, the evidentiary foundation issue was crucial to the outcome of the count seeking to except from discharge $19,868.76 of the gold card account.

Although Vinhnee's admission that he owed $21,098.00 on the platinum card made that aspect of the evidentiary problem less acute, dates and details were still missing. The court also discerned a failure of proof as to the substantive element of nondischargeability under § 523(a)(2)(A) under which a creditor must prove justifiable reliance. It ruled that the issuance of the platinum card in February 2003 was unjustifiable in light of the absence of evidence of inquiry into Vinhnee's income, which it reasoned would have exposed income too low to support the card.

Following entry of judgment for the defendant on all counts, this appeal ensued.

## JURISDICTION

The bankruptcy court had jurisdiction via 28 U.S.C. §§ 1334 and 157(b)(1). We have jurisdiction under 28 U.S.C. § 158(a)(1).

## ISSUE

Whether the court erroneously refused to admit computer-generated records as not properly authenticated.

## STANDARD OF REVIEW

 Evidentiary rulings, including admissibility of electronic records, are reviewed for abuse of discretion. *E.g., Sec.*

*Farms v. Int'l Bhd. of Teamsters*, 124 F.3d 999, 1011 (9th Cir.1997); *United States v. Catabran*, 836 F.2d 453, 456 (9th Cir.1988). Whether there has been proof of an essential element of a cause of action under 11 U.S.C. § 523(a)(2)(A) to except a debt from discharge is a factual determination reviewed for clear error. *Anastas v. Am. Sav. Bank (In re Anastas)*, 94 F.3d 1280, 1283 (9th Cir.1996).

## DISCUSSION

### I

The nub of American Express' argument for admission of its electronic business records into evidence is an assertion that it is an abuse of discretion for a court to require that all elements of an evidentiary foundation be established by testimony of a qualified witness. Hence, it contends that the court was *required*, apparently as a matter of law, to fill the gap by taking judicial notice of the accuracy and reliability of American Express computer systems. The standard of review makes American Express' persuasive task a difficult row to hoe.

■ The court acts as gatekeeper on the preliminary questions regarding the admissibility of evidence. Fed.R.Evid. 104.[2]

■ In general, rulings on admissibility of evidence are reviewed for abuse of discretion. *Sec. Farms*, 124 F.3d at 1011. In particular, determination of the sufficiency of authentication of evidence rests in the sound discretion of the trial court and is reviewed for abuse. *Id.*[3]

■ Under the abuse of discretion standard of review, we would reverse only if the court applied an incorrect standard of law or made a clearly erroneous factual determination or if we have the firm and definite conviction that the court made a clear error of judgment. *SEC v. Coldicutt*, 258 F.3d 939, 941 (9th Cir.2001); *cf. Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 400–05, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).

■ It follows that a trial court that is finicky about settled authentication requirements will be sustained unless we have the firm and definite conviction that there was a clear error of judgment in rejecting the proffered authentication. Thus, American Express must persuade us that we should have a firm and definite conviction that there was a clear error of judgment in rejecting its exhibits.

2. The pertinent portions of the rule are:

(a) Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b) [relevancy conditioned on fact]. In making its determination it is not bound by the rules of evidence except those with respect to privileges.

(b) Relevancy conditioned on fact. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of fulfillment of the condition.

Fed.R.Evid. 104(a)-(b).

3. Because this appeal involves a bench trial in which the roles of court and trier of fact are merged, we need not address the differences between Rules 104(a) and (b). There is authority that authenticity implicates Rule 104(b) "relevancy conditioned on fact" as to which the court makes a preliminary ruling and leaves to the trier of fact the ultimate resolution of the authenticity question. 5 JOSEPH M. MCLOUGHLIN ED., WEINSTEIN'S FEDERAL EVIDENCE 2D § 900.06[1][c][i] (2005) ("WEINSTEIN"), *citing* Fed.R.Evid. 901 advisory committee's note. Since the functions were merged and the court was not persuaded that the records were authentic, the distinction makes no difference in this appeal.

## A

█ The basic elements for the introduction of business records under the hearsay exception for records of regularly conducted activity all apply to records maintained electronically.

█ Such records must be: (1) made at or near the time by, or from information transmitted by, a person with knowledge; (2) made pursuant to a regular practice of the business activity; (3) kept in the course of regularly conducted business activity; and (4) the source, method, or circumstances of preparation must not indicate lack of trustworthiness. Fed.R.Evid. 803(6);[4] *Catabran*, 836 F.2d at 457.

█ These elements must either be established by the testimony of the custodian or other qualified witness or must meet prescribed certification requirements. Fed.R.Evid. 803(6).

█ Such records, however, will not be admitted unless the court is also persuaded by their proponent that they are authentic. Ordinarily, because the business record foundation commonly covers the ground, the authenticity analysis is merged into the business record analysis without formal focus on the question. 5 Weinstein § 900.06[2][a].

█ The primary authenticity issue in the context of business records is on what has, or may have, happened to the record in the interval between when it was placed in the files and the time of trial. In other words, the record being proffered must be shown to continue to be an accurate representation of the record that originally was created.

## B

█ Authenticating a paperless electronic record, in principle, poses the same issue as for a paper record, the only difference being the format in which the record is maintained: one must demonstrate that the record that has been retrieved from the file, be it paper or electronic, is the same as the record that was originally placed into the file. Fed.R.Evid. 901(a).[5]

█ Hence, the focus is not on the circumstances of the creation of the record, but rather on the circumstances of the preservation of the record during the time it is in the file so as to assure that the document being proffered is the same as the document that originally was created.

█ In the case of a paper record, the inquiry is into the procedures under which the file is maintained, including custody, access, and procedures for assuring that

---

**4.** The pertinent hearsay exception is:

(6) Records of Regularly Conducted Activity.—A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or

circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
Fed.R.Evid. 803(6).

**5.** The authentication rule provides:

(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
Fed.R.Evid. 901(a).

the records in the files are not tampered with. The foundation is well understood and usually is easily established. *See* ED-WARD J. IMWINKELRIED, EVIDENTIARY FOUNDA-TIONS § 4.03[1] (5th ed.2002) ("IMWINKEL-RIED"); 5 WEINSTEIN § 900.07[1][b][i].

The paperless electronic record involves a difference in the format of the record that presents more complicated variations on the authentication problem than for paper records. Ultimately, however, it all boils down to the same question of assurance that the record is what it purports to be.

 The logical questions extend beyond the identification of the particular computer equipment and programs used. The entity's policies and procedures for the use of the equipment, database, and programs are important. How access to the pertinent database is controlled and, separately, how access to the specific program is controlled are important questions. How changes in the database are logged or recorded, as well as the structure and implementation of backup systems and audit procedures for assuring the continuing integrity of the database, are pertinent to the question of whether records have been changed since their creation.

There is little mystery to this. All of these questions are recognizable as analogous to similar questions that may be asked regarding paper files: policy and procedure for access and for making corrections, as well as the risk of tampering. But the increasing complexity of ever-developing computer technology necessitates more precise focus.

Some of these questions are becoming more important as the technology advances. For example, digital technology makes it easier to alter text of documents that have been scanned into a database, thereby increasing the importance of audit procedures designed to assure the continuing integrity of the records. *See* George L. Paul, *The "Authenticity Crisis" in Real Evidence,* 15 PRAC. LITIGATOR No. 6, at 45–49 (2004). This adds an extra dimension to consideration of whether the computer was "regularly tested" for errors. *See* 5 WEINSTEIN § 901.11[2] (2005).

This ever-expanding complexity of the cyberworld has prompted the authors of the current version of the *Manual for Complex Litigation* to note that a judge should "consider the accuracy and reliability of computerized evidence" and that a "proponent of computerized evidence has the burden of laying a proper foundation by establishing its accuracy." MANUAL FOR COMPLEX LITIGATION (FOURTH) § 11.446 (2004),[6] *citing with approval,* Gregory P. Joseph, *A Simplified Approach to Computer–Generated Evidence and Animations,* 43 N.Y.L. SCH. L. REV. 875 (1999–2000).

In effect, it is becoming recognized that early versions of computer foundations were too cursory, even though the basic elements covered the ground. For example, it has been said that a qualified witness must testify as to the mode of record

---

**6.** A fuller description of the problem is:

In general, the Federal Rules of Evidence apply to computerized data as they do to other types of evidence. Computerized data, however, raise unique issues concerning accuracy and authenticity. Accuracy may be impaired by incomplete data entry, mistakes in output instructions, programming errors, damage and contamination of storage media, power outages, and equipment malfunctions. The integrity of data may also be compromised in the course of discovery by improper search and retrieval techniques, data conversion, or mishandling.

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 11.446.

preparation, that the computer is the standard acceptable type, and that business is conducted in reliance upon the accuracy of the computer in retaining and retrieving information. BARRY RUSSELL, BANKRUPTCY EVIDENCE MANUAL ¶ 803.17 (2005) ("RUSSELL"); *cf.* 5 WEINSTEIN § 900.07[1][c]. These several elements, however, subsume a number of constituent elements.

Rule 901(b)(9), which is designated as an example of a satisfactory authentication, describes the appropriate authentication for results of a process or system and contemplates evidence describing the process or system used to achieve a result and demonstration that the result is accurate. Fed.R.Evid. 901(b) (9).[7] The advisory committee note makes plain that Rule 901(b) (9) was designed to encompass computer-generated evidence and also that it did not preclude taking judicial notice in appropriate circumstances.[8]

Indeed, judicial notice is commonly taken of the validity of the theory underlying computers and of their general reliability. IMWINKELRIED § 4.03[2]; RUSSELL § 901.9. Theory and general reliability, however, represent only part of the foundation.

Professor Imwinkelried perceives electronic records as a form of scientific evidence and discerns an eleven-step foundation for computer records:

1. The business uses a computer.

2. The computer is reliable.

3. The business has developed a procedure for inserting data into the computer.

4. The procedure has built-in safeguards to ensure accuracy and identify errors.

5. The business keeps the computer in a good state of repair.

6. The witness had the computer read-out certain data.

7. The witness used the proper procedures to obtain the readout.

8. The computer was in working order at the time the witness obtained the readout.

9. The witness recognizes the exhibit as the readout.

10. The witness explains how he or she recognizes the readout.

11. If the readout contains strange symbols or terms, the witness explains the meaning of the symbols or terms for the trier of fact.

IMWINKELRIED § 4.03[2].

Although this is a generally serviceable modern foundation, the fourth step warrants amplification, as it is more complex than first appears. The "built-in safeguards to ensure accuracy and identify errors" in the fourth step subsume details regarding computer policy and system control procedures, including control of access to the database, control of access to the program, recording and logging of changes, backup practices, and audit pro-

---

7. The rule provides:
 (9) Process or system. Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result.
 Fed.R.Evid. 901(b)(9).

8. The Advisory Committee Note explains:
 Example 9 is designed for situations in which the accuracy of a result is dependent upon a process or system which produces it. X rays afford a familiar instance. Among more recent developments is the computer, as to which see *Transport Indemnity Co. v. Seib,* 178 Neb. 253, 132 N.W.2d 871 (1965); [other citations omitted]. Example (9) does not, of course, foreclose taking judicial notice of the accuracy of the process or system.
 Fed.R.Evid. 901(b)(9) advisory committee's note.

cedures to assure the continuing integrity of the records.

With that qualification, we evaluate American Express' exhibits through the prism of the Imwinkelried foundation.

### C

The foundational problem encountered by American Express during the trial related primarily to authentication.

#### 1

■ The testimony of the records custodian at trial regarding the computer equipment used by American Express was vague, conclusory, and, in light of the assertion that "[t]here's no way that the computer changes numbers," unpersuasive.[9]

Similarly, the testimony of the records custodian regarding software indicated lack of knowledge on that subject as well.[10]

We do not perceive error in the trial court's assessment of this testimony as indicating that the records custodian did not seem to know anything "of any consequence either about the software or the hardware."[11] We certainly cannot say that we have a definite and firm conviction that there was a clear error of judgment in rejecting the exhibits based on this testimony.

#### 2

The trial court held the record open to permit the filing of a declaration by a witness qualified to complete the foundation for the admission of the electronic records.

■ The admissibility of evidence is a preliminary question for the court to resolve, which may be done on declaration without being bound by the rules of evidence other than privilege rules. Fed. R.Evid. 104(a).

Indeed, Federal Rules of Evidence 803(6) and 902(11) were amended in 2000 expressly to authorize self-authentication of a business record by "written declaration of its custodian or other qualified person" in certain circumstances. Fed. R.Evid. 803(6) ("qualified witness") & 902(11) ("qualified person"). Hence, the court's authorization of completing the foundation by declaration of a "qualified" witness was appropriate.

---

9. The records custodian's testimony regarding the computer was:

> Q. You indicated previously that there was a mainframe computer keeping these records; is that correct?
> A. Correct.
> Q. And is this a—what type of system would this be? Do you have any—
> A. You know, I don't—I couldn't testify to exactly what—what the model is or anything like that. It's—you know, our computer system that we've used for, you know, quite some time to produce the documents, to gather the information, to store the information and then, you know, produce the statements to the card members. And we— you know, it's highly accurate. It's based on the fees that go in. There's no way that the computer changes numbers or so. It's all what is presented to it from the electron-

ic feeds from the service merchants or establishments where the charges were made. Tr. 3/25/04 at 12–13.

10. The records custodian's testimony regarding the software was:

> Q. Did the software that this used is— what type of a software is it? Is it accounting software or is it billing software? What kind of software is it?
> A. It's—I don't know exactly what it is. I mean, it's a combination of both because it does take the charges as mentioned, electronic files, puts them together in a mode. It sorts them, puts them to the correct account numbers, the correct accounts, and then the billing statements are produced from that.

Tr. 3/25/04 at 13–14.

11. Tr. 3/25/04 at 14.

The trial court concluded that the declaration in the post-trial submission was doubly defective. First, the declaration did not establish that the declarant was "qualified" to provide the requisite testimony. Second, the declaration did not contain information sufficient to warrant a conclusion that the "American Express computers are sufficiently accurate in the retention and retrieval of the information contained in the documents."

 The qualifications of the declarant were particularly important because the assertions regarding reliability and accuracy of the American Express computers were fundamentally conclusory and in the nature of opinion. While a "qualified" witness or person under Rules 803(6) and 902(11) need not be an expert, there needs to be enough information presented to demonstrate that the person is sufficiently knowledgeable about the subject of the testimony. *See* 5 WEINSTEIN § 900.07[1][d].

 Here, the declarant merely asserted that he is employed by American Express and is personally familiar with the hardware and software and computer record-keeping systems in use in the credit card industry. He did not indicate his job title or anything about his training and experience that would import an aura of verisimilitude to his assertions.[12]

The trial court ruled that this was not adequate qualification of the witness because the "declaration contains no information at all about [declarant's] background and training or whether and to what extent he is knowledgeable about the American Express computers, or how he obtained such information."[13] Since it is apparent that the trial court did not know whether the declarant was a seasoned professional manager of computer records or a janitor, we perceive no error in this ruling and do not have a definite and firm conviction that there was a clear error of judgment in rejecting the declaration on this ground.

 Regardless of the question of the declarant's qualifications, the trial court also ruled that the declaration was deficient as to basic foundational requirements for admission of electronic records, noting particularly the need to show the accuracy of the computer in the retention and retrieval of the information at issue.

The declaration merely identified the makes and models of the equipment, named the software, noted that some of the software was customized, and asserted that the hardware and software are standard for the industry, regarded as reliable, and periodically updated.[14] There is

12. The declarant's putative qualifications were:

> I am employed by American Express Travel Related Services Company, Inc. ("American Express"), plaintiff herein. The facts stated are within my personal knowledge. I am personally familiar with the computer hardware and software used by American Express in its billing and cardmember information system. I am also personally familiar with the credit card industry and the computer record keeping systems generally in use in the industry.
> Declaration, 4/1/04, at 1.

13. Findings of Fact and Conclusions of Law at 3.

14. The pertinent portion of the declaration in the post-trial submission was:
> Storage of the cardmember information is on an IBM Mainframe Z390 Computer. American Express has 22 of these computers currently in operation. The billing software is mainly performed using the "Triumph" software package purchased from Arthur Anderson. In addition to the "Triumph" software there is also the "Legacy" software package.
> The system that tracks and stores the Record's [sic] of Charges, (ROC's), is the

no information regarding American Express' computer policy and system control procedures, including control of access to the pertinent databases, control of access to the pertinent programs, recording and logging of changes to the data, backup practices, and audit procedures utilized to assure the continuing integrity of the records. All of these matters are pertinent to the accuracy of the computer in the retention and retrieval of the information at issue.

In view of the cursory nature of the declaration and the lack of basic information that would provide assurance that the record reproduced from the electronic media is identical to the record that was originally stored, we perceive no error and do not have a definite and firm conviction that there was a clear error of judgment in determining that the evidentiary foundation was inadequate.

## II

The court's refusal to admit the monthly billing statements in evidence left American Express with only evidence of the debtor's statement in entries on Schedule F (Creditors Holding Unsecured Nonpriority Claims) that showed amounts owed that were not designated as disputed.

■ These entries on the debtor's verified schedules constitute statements by (or adopted by) a debtor that qualify, when offered against the debtor, as admissions by a party opponent that are not hearsay. Fed.R.Evid. 801(d); Russell § 801.13.

The limitation of the evidence to these admissions created two hurdles for American Express. First, as the admissions were only as to total amounts owed, there was no evidence regarding the details of charges as to number, amounts, dates, and nature of expenses. Second, the $3,245.00 admitted to be owed on the gold card was less than the $5,617.16 that American Express conceded to be dischargeable with respect to that card account, which hurdle became particularly aggravating to American Express when the court noted that, if the gold card statements were in evidence, it would have excepted from discharge most of the remaining $19,868.76 owed on the gold card.[15]

## III

■ We reject as lacking in merit the two assigned errors in which American Express contends that the court was required to enter a default judgment and was not permitted to dismiss the action without a trial. The essential problem is that American Express transmogrifies the record in order make such assertions.

Procedurally, what occurred was a trial, not a default judgment hearing. The clerk's docket entry from the December 23, 2003, status hearing noted "Ruling: Trial—2–19–04 at 10:00 a.m." The docket entry reflecting continuation to the ulti-

World Wide Card Authorization System, (WWCAS). This system was written by American Express based on IBM structure guidelines.

A Kodak Imaging System is used to image payments, correspondence, etc. for use in the American Express network.

The hardware and software is reliable and has been in use for some time and is periodically updated. The IBM mainframes are standard for the industry and are known for their reputation for reliabili-

ty. The software is recognized in the industry as appropriate and reliable for this use. Declaration 4/1/04 at 2.

15. As our resolution of the evidentiary issue regarding the gold card is logically fatal to the count regarding the platinum card as well, we need not address the assignment of error questioning the trial court's ruling that American Express did not justifiably rely on assumptions regarding the debtor's income when it issued the platinum card.

mate trial date of March 25, 2004, was to the same effect: "Notice of continued hearing Trial; Filed by: Dennis C. Winters, Attorney for Plaintiff." Moreover, American Express' counsel believed he was participating in a trial, as evidenced by his specific reference to it as a trial during the proceeding.[16]

Although counsel now represents in his brief that he filed a "Request and Application for Default Judgment," the docket does not mention any such document. Nothing in the record suggests that the court was being asked to enter a default judgment or believed it was conducting a default judgment hearing.

In fine, it was plain at the time, and is still plain, that the court conducted a trial on the merits of plaintiff's case on March 25, 2004. There was no pending motion for default judgment. American Express was fully apprised in advance that the proceeding would be a trial and did not, at the time of trial, object to the trial.

To be sure, American Express suffered the ignominy of losing even though its opponent did not show up. There is, however, little difference between that and the plaintiff who suffers an adverse judgment on partial findings before the defense puts on its case. Fed.R.Civ.P. 52(c). What is required is that American Express have

been fully heard on the issues of nondischargeability, which happened.

When a court fixes a formal trial date in advance and says at the time that it is conducting a trial, that means that it is not a dress rehearsal and that the day has come for the respective parties to present their cases once and for all. American Express had its full due process opportunity to establish that the debts should be excepted from discharge and did not prevail. It is too late to reinvent the record.

Hence, there is neither factual basis nor substantial merit in the other two assigned errors: "whether the Bankruptcy Court erred when it dismissed the Appellants complaint, instead of setting the matter for trial"; and "whether the Bankruptcy Court erred as a matter of law when it refused to grant a default judgment in favor of the Appellant when the Appellee did not answer or otherwise defend the Complaint, thereby making certain admissions." The record demonstrates that there was a trial and that there was no motion for default judgment.

There was no procedural error.[17]

\* \* \* \* \* \*

We conclude that it was not an abuse of discretion for the trial court to refuse to admit plaintiff's monthly billing statements regarding the debtor, that without such evidence the essential elements of Ameri-

---

16. Not only is the transcript titled "Trial Re Complaint To Determine Dischargeability Of Debt," a relevant portion of the transcript reads:

 THE COURT: Very well, sir. We talked about having another witness.

 MR. WINTERS: Yes, your Honor. What I would request is, since this is all your— what you basically asked for is just information on the—on the type of computer and software and the foundational issues, that for this matter alone, if we could just adjourn the *trial* and allow me to submit that on a declaration basis rather than bringing

a witness out simply to testify on that small a matter, that could be the most expeditious way of handling that issue.

Tr. 3/25/04 at 49 (emphasis supplied).

17. At oral argument of this appeal, counsel for American Express conceded that the defendant may not have been served by mail at the correct address. If this matter were to make its way back to the trial court, it would be permissible for it to conduct the fact-finding probative of whether it had personal jurisdiction. *See Morris v. Peralta (In re Peralta)*, 317 B.R. 381, 386–87 (9th Cir. BAP 2004).

451

can Express' case under § 523(a)(2)(A) were not established, and that there was no other error.

AFFIRMED.