NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | ) BAP No. CC-11-1096-DKiPa |
| | ) |
| GLENN S. THOMAS, | ) Bk. No. 09-38191-CB |
| | ) |
| Debtor. | ) Adv. No. 10-01053-CB |
| _____ | ) |
| | ) |
| JUSTIN PARRISH, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) **M E M O R A N D U M**[1] |
| | ) |
| GLENN S. THOMAS, | ) |
| | ) |
| Appellee. | ) |
| _____ | ) |

Submitted Without Argument on September 23, 2011
at Pasadena, California

Filed - October 7, 2011

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Catherine E. Bauer, Bankruptcy Judge, Presiding

_____

Appearances:   Appellant Justin Parrish, pro se, on brief; Appellee
Glenn S. Thomas, pro se, on brief.

_____

Before:  DUNN, KIRSCHER, and PAPPAS, Bankruptcy Judges.

_____

[1]    This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may have
(see Fed. R. App. P. 32.1), it has no precedential value. See 9th
Cir. BAP Rule 8013-1.

The bankruptcy court dismissed an adversary proceeding on the basis that the creditor did not establish that the debt was incurred by fraud for purposes of § 523(a)(2)(A).[2] While we have serious concerns about the process by which the bankruptcy court reached its conclusions, we AFFIRM, because based upon our review, any error by the bankruptcy court did not affect the ultimate determination where we agree that the creditor did not prove, by a preponderance of the evidence on each of the required elements, that the debt was incurred by fraud.

## I. FACTS

Between April 29, 2008, and August 1, 2008, Justin Parrish loaned Glenn S. Thomas and/or Mr. Thomas's business affiliates $198,120.38 in nine separate transactions. During the period July 2008 through November 2008, Mr. Thomas made payments to Mr. Parrish on the loans in an aggregate amount of $9,120.00. In May 2009, having received no further payments from Mr. Thomas, Mr. Parrish sued Mr. Thomas in the Superior Court of California, County of Orange ("State Court Suit"), alleging, inter alia, that the debt Mr. Parrish was owed was the result of fraudulent conduct by Mr. Thomas in obtaining the loans. The record does not reflect whether judgment was entered against Mr. Thomas in the State Court Suit.

---

[2] Unless otherwise specified, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. "Civil Rule" references are to the Federal Rules of Civil Procedure.

Mr. Thomas filed a voluntary chapter 7 petition on November 20, 2009. On January 28, 2010, Mr. Parrish filed an adversary proceeding in the bankruptcy court seeking to have Mr. Thomas's debt[3] to him declared nondischargeable pursuant to § 523(a)(2).

Following the parties' unsuccessful attempt to mediate the dispute, the bankruptcy court set the matter for trial ("Trial"), utilizing an "Order Setting Trial Date and Establishing Procedures for Conduct of Trial" ("Trial Procedures Order"). As relevant to the appeal before this Panel, the Trial Procedures Order (a) mandated the presentation of direct testimony by declaration, (b) established the procedure for marking, assembling, and lodging exhibits with the bankruptcy court, and (c) clarified that unless the parties were prepared to stipulate the exhibits into evidence, bona fide objections were reserved and the issue of admissibility was deferred until an exhibit was offered into evidence.[4] The Trial

---

[3] An individual named Robert Vance also was involved in some of these transactions. The complaint in the adversary proceeding named Mr. Vance as a defendant. The bankruptcy court dismissed Mr. Vance from the adversary proceeding both because he was not the debtor in the case in which the adversary proceeding was filed, and, more importantly, because he was a debtor in a case in the Eastern District of California, with the consequence that the automatic stay precluded Mr. Parrish from including Mr. Vance as a defendant in his adversary proceeding against Mr. Thomas.

[4] Specifically, paragraph B.3. of the Trial Procedures Order states:

If a witness refers in [his] declaration to an exhibit to be admitted into evidence, the exhibit must be identified in the declaration by exhibit number or letter. The
(continued...)

3

Procedures Order set February 14, 2011, as the deadline for the parties to submit written objections to the admission of exhibits to opposing counsel, and required the parties to lodge the written objections with the Courtroom Deputy no later than February 17, 2011. Finally, the Trial Procedures Order stated that evidentiary objections would be adjudicated at the time an exhibit was offered

[4](...continued)
exhibit itself need not be attached to the witness's declaration, but must be included in the exhibit binder and marked for identification in accordance with Section C of this order. Unless the parties stipulate to the admittance of an exhibit, the foundation for admittance of exhibits (other than for impeachment or rebuttal purposes) must be established in the declaration. Exhibits referenced in any declaration should be offered into evidence when the declaration is offered into evidence.

Paragraph C.2. states:

All exhibits must be assembled in a binder and lodged with the Courtroom Deputy by the deadline set forth in Section D. Each such binder must include as its first page an exhibit register. Parties are required to assemble an original and four (4) copies of its exhibit binders.

Paragraph C.3. states:

At the commencement of trial, the parties must be prepared to stipulate into evidence all exhibits that are admissible for at least one purpose. Bona-fide objections may be reserved, with the issue of admissibility deferred, until the exhibit is offered into evidence.

Paragraph D.5. states in relevant part:

Evidentiary objections will be adjudicated at the time a witness declaration or exhibit is offered into evidence.

4

into evidence.

A.    Mr. Thomas's Motions

On January 28, 2011, Mr. Thomas filed a motion to dismiss the adversary proceeding ("Dismissal Motion"), asserting that Mr. Parrish had failed to comply with the Trial Procedures Order's meet and confer requirement, which precluded the discussion and resolution of evidentiary issues. Mr. Parrish opposed the Dismissal Motion, asserting that Mr. Thomas had failed to cooperate in preparing the case for trial. In his declaration in support of his opposition, Mr. Parrish stated:

> I am alleging that [Mr. Thomas] has defrauded me of over $150,000. Because I have brought this adversary action [Mr. Thomas is] alleging that I am harassing [him]. [Mr. Thomas] and his business partner Robert M. Vance seem to enjoy making fun of me and insulting me.
> As a result of this, I am reluctant to meet with them in person or take their telephone calls. I wrote Mr. Thomas and advised [him] of our responsibilities under the local rules. I asked him to stipulate to the authenticity of documents. He pretended not to receive my letter.
> He then refused to stipulate to the authenticity of any documents, all of which he and his partner produced, and my checks, which he happily cashed. Very little cooperation was needed in order to produce the Pretrial Order. My efforts to comply with the [Trial Procedures Order] are detailed in my Declaration currently on file.

On February 3, 2011, Mr. Thomas filed a motion to exclude ("Exclusion Motion") the declaration testimony of all of Mr. Parrish's witnesses except for Mr. Parrish himself. The bankruptcy court set the Dismissal Motion and the Exclusion Motion to be heard at the time of the Trial.

B.    Mr. Parrish's Witness Declarations

Consistent with the Trial Procedures Order, On February 17,

5

2011, Mr. Parrish filed four witness declarations, the substance of which we summarize below.

1. Declaration of Justin Parrish ("Parrish Declaration")

a. The Fiber Optic Job

Mr. Parrish testified that Mr. Thomas represented to him that he and Mr. Vance had a large construction contract with QWEST to lay 39.5 miles of fiber optic cable in Northern California, when in fact Mr. Thomas and Mr. Vance were only subcontractors on the fiber optic job, and the work they were hired to do was "very minor." Mr. Parrish further testified that Mr. Thomas and Mr. Vance represented to him that they needed to borrow $74,000.38 to purchase heavy equipment to perform the fiber optic job, when in fact (1) they did not need the equipment to perform the sub-contract, (2) they never purchased the equipment, and (3) the Equipment Lease and Purchase Agreement Mr. Thomas prepared in connection with the loan was fraudulent.

Mr. Parrish testified that he was introduced to Mr. Thomas by a mutual business associate, Dave Mesa, after Mr. Parrish told Mr. Mesa that he had a home equity line of credit and that he wished to loan out money from that credit line at a higher rate of interest than would be owed on the credit line. Mr. Parrish testified that at their first meeting, Mr. Thomas "explained to me that he was involved in a large fiber optic job in Northern California, but that he needed capital to land the job." Mr. Thomas did not immediately accept Mr. Parrish's offer to loan him money at 15% interest. On April 29, 2008, Mr. Thomas and Mr. Parrish talked about Mr. Thomas's

6

capital needs for the large fiber optic job in Northern California. Mr. Thomas explained that he and Mr. Vance needed funding for the fiber optic job but the banks were not lending.  Mr. Thomas showed Mr. Parrish a joint venture agreement ("Joint Venture Agreement") between Mr. Thomas and Mr. Vance.[5]  The Parrish Declaration referred to a copy of the Joint Venture Agreement as having been "marked as Exhibit 1."  It appeared to Mr. Parrish from the Joint Venture Agreement that Mr. Thomas and Mr. Vance were both California Licensed Contractors who had combined forces to do a large fiber optic job.

Based upon (1) Mr. Thomas's representation that the joint venture had a big job laying 39.5 miles of fiber optic cable, (2) representations in the Joint Venture Agreement that (a) described the sums of money that Mr. Thomas and Mr. Vance were bringing to the joint venture, including Mr. Thomas's investment of what Mr. Parrish asserts was "substantial sums of money" to finance the project, and (b) recited that Mr. Thomas and Mr. Vance both were licensed California contractors, and (3) the promises of Mr. Thomas and Mr. Vance to repay any loans, Mr. Parrish decided to loan Mr. Thomas and Mr. Vance money at 15% interest.

Mr. Parrish made the following loans, all at the request of Mr. Thomas:

---

[5]   The Joint Venture Agreement stated that the exclusive purpose of the joint venture was to be "[c]onstruction of 39.5 Qwest Fiber job in Sacramento, Ca.  Obtain AT&T ACAS Direct bidding system."

7

- $25,000 payable to the joint venture on April 29, 2008, so that the joint venture could "get started." The Parrish Declaration referred to a copy of this check as having been "marked as Exhibit 2."
- $25,000 payable to the joint venture on May 9, 2008, after Mr. Thomas stated the joint venture had the big fiber optic job and was getting started but needed additional funds to "get going." The Parrish Declaration referred to a copy of this check as having been "marked as Exhibit 3."
- $60,446.43 payable to the joint venture on May 16, 2008, to fund the purchase of items of heavy equipment identified in the Equipment Lease. The Parrish Declaration referred to a copy of the Equipment Lease as having been "attached as Exhibit 4." The Parrish Declaration referred to a copy of this check "which be [sic] offered as Exhibit 5." Mr. Thomas represented to Mr. Parrish that the joint venture would purchase the equipment identified in the Equipment Lease in Mr. Parrish's name and that the titles to that equipment would be in the name of Mr. Parrish, who then would lease the equipment to the joint venture.
- $13,554.75 payable to the joint venture on May 30, 2008, based upon Mr. Thomas's representation that the joint venture needed additional heavy equipment. The Parrish Declaration "offered as Exhibit 6" a copy of this check. On May 30, 2008, Mr. Thomas, Mr. Vance, and Mr. Parrish all signed an "Addendum to Lease," which stated that the total lease amount was to be

8

$74,000.38, with a monthly payment of $3,360.85 to commence on June 30, 2008. The Parrish Declaration "offered as Exhibit 7" a copy of the Addendum to Lease.

- $30,000 payable to the joint venture on June 25, 2008, based on Mr. Thomas's representation that everything was going fine on the fiber optic job but that the joint venture needed an additional $30,000 for "additional operating expenses." The Parrish Declaration "presented as Exhibit 8" a copy of this check. At the same time, Mr. Thomas presented Mr. Parrish with an "Addendum to Joint Venture Agreement," which reflected that $80,000 was the amount "invested" by Mr. Parrish. The Parrish Declaration "attached as Exhibit 13" a copy of the Addendum to Joint Venture Agreement.

Mr. Parrish testified that he received payments of $3,360 in July 2008 and in August 2008, followed by three monthly payments in the amount of $800 each in September, October and November 2008. Mr. Parrish received no further payments with respect to any of the loans.

Mr. Parrish testified that he asked Mr. Thomas to send him the titles to the equipment, but Mr. Thomas "kept putting me off." After the payments stopped, Mr. Thomas told Mr. Parrish that the government had "pulled the permits" on the fiber optic job for environmental reasons and that it had been shut down. Mr. Thomas provided Mr. Parrish a letter from Mr. Vance to substantiate the explanation. The Parrish Declaration "offered as Exhibit 11" a copy of Mr. Vance's letter to Mr. Thomas. Mr. Parrish further testified

9

that he first learned that the joint venture had not purchased the equipment when Mr. Vance filed a bankruptcy petition in the Eastern District of California. The Parrish Declaration "offered as Exhibit 10" a copy of Mr. Vance's Affidavit, which stated: "A decision was made between myself, [Mr. Thomas] and [Mr. Parrish] to forego buying the new equipment and utilize the funds we already had for that purpose of keeping the job payrolls and material purchases going."

Mr. Parrish testified that he first learned that the fiber optic job was only a subcontract when Mr. Thomas made the mandatory disclosures in the adversary proceeding. Through discovery he also learned that the joint venture had been "kicked off" the fiber optic job.

   b. <u>"Personal" loans to Mr. Thomas</u>

In addition to loans to the joint venture, Mr. Parrish also made several loans to Mr. Thomas for his "personal projects," as follow:

- $17,500 as a personal loan on April 29, 2008. $15,000 of this amount was paid to Pacific Coast Construction and Electric ("Pacific Coast"), Mr. Thomas's "dba";[6] $2,500 of this amount was paid to Mr. Mesa at Mr. Thomas's request. This loan was to be repaid by February 2009. Mr. Thomas offered as collateral for this loan his custom Harley Davidson motorcycle. The Parrish Declaration "offered as Exhibit 12" a copy of the

---

[6] The record reflects that this check actually was made payable to Mr. Thomas.

10

promissory note. The Parrish Declaration "offered as Exhibit 13" a copy of Mr. Thomas's "pink slip" to the motorcycle. Finally, the Parrish Declaration "offered as Exhibits 14 and 15" copies of the checks to "Pacific Coast" and to Mr. Mesa.

- $6,000 to Mr. Thomas on May 23, 2008, for personal expenses. Mr. Thomas stated he would be able to repay this loan from the proceeds of a job he and Mr. Mesa were working on together. This loan was to bear interest at 10% rather than 15% because it was to be a short term loan. The Parrish Declaration "offered as Exhibit 16" a copy of this check.

- $6,000 to Mr. Thomas on June 30, 2008, for further operating expenses for his business. Because Mr. Thomas represented that he would be able to repay this loan "soon" from the proceeds of a job he and Mr. Mesa were working on together, this loan also bore interest at 10% rather than 15%. The Parrish Declaration "offered as Exhibit 17" a copy of this check.

- $14,620 to Pacific Coast on August 1, 2008, based on (1) Mr. Thomas's statement that he needed that amount to post a bond for a job in Beaumont, (2) Mr. Parrish's belief, as suggested by Mr. Thomas's statements, that Mr. Mesa would be involved in the Beaumont project, and (3) Mr. Thomas's promise to repay the loan. The Parrish Declaration "offered as Exhibit 18" a copy of this check. Mr. Parrish learned in discovery that Mr. Thomas never got this job; neither did Mr. Thomas return the money that no longer was required for the bond. The Parrish Declaration "offered as Exhibit 19" a copy of Mr.

11

Thomas's affidavit.

2. <u>Declaration of Cory Wattenbarger ("Wattenbarger Declaration")</u>

Mr. Wattenbarger is a California Licensed Engineering Contractor, whose testimony was offered as that of an expert witness.[7] Mr. Wattenbarger testified that Golden State Utilities, not the joint venture, was the general contractor for the fiber optic job. In response to a subpoena from Mr. Parrish, Golden State Utilities provided a copy of its subcontract with the joint venture. The services the joint venture was to perform under the subcontract consisted of "digging out holes for . . . hand holes or manholes with a backhoe and dump truck, installing the hand holes or manholes and then replacing the dirt, asphalt or concrete when fully installed." The purpose of the work was to connect individual customers of QWEST to the main fiber optic line previously installed by Golden State Utilities. The subcontract did not state an exact quantity of work to be performed; instead it stated the amount of work was "to be determined," and provided a unit price for each item to be done.

Based on his review of "all of the materials"[8] and upon his

---

[7] Mr. Parrish also filed a "qualification" declaration for Mr. Wattenbarger, which does nothing more than detail Mr. Wattenbarger's experience.

[8] Mr Wattenbarger testified that he had reviewed pre-trial disclosures filed by both Mr. Thomas and Mr. Vance, Mr. Thomas's bankruptcy petition and schedules, the Joint Venture Agreement, the
(continued...)

12

experience in supervising fiber optic jobs, Mr. Wattenbarger testified that he believed Mr. Thomas's representation to Mr. Parrish that the joint venture needed $60,000 in capital to get the job and keep it going was false. Mr. Wattenbarger testified that to perform the subcontract, the joint venture would need general liability insurance, workers' compensation insurance, and a current contractor's license. It would need "[p]erhaps a few thousand dollars to cover expenses such as diesel fuel." Under the subcontract, the joint venture was required to supply HDPE pipe, fiberglass manholes and hand holes, concrete manholes and fiber optic cable. Mr. Wattenbarger speculated that "[d]epending upon their credit at contractor warehouses, they probably could have purchased these items on credit." Mr. Wattenbarger opined that the joint venture would have needed only a very small sum to work on the sub-contract. To support this opinion, Mr. Wattenbarger explained:

> If [the joint venture] had all of the equipment it needed, then it would need to supply diesel fuel to run the back hoe, dump truck and an air compressor. [The joint venture] was required to provide a four man crew. These would be paid by wages, which payment could be delayed for a week or two. [Golden State Utilities] would provide progress payments and might advance job related costs to Diamond Utilities as is common in the industry.

Wattenbarger Declaration at 5:10-15. (Emphasis added.) Mr. Wattenbarger reiterated that to perform the subcontract, the joint

---

[8](...continued)
Equipment Lease, Mr. Thomas's declaration of his direct testimony, and documents produced by Golden State Utilities in response to a subpoena from Mr. Parrish.

13

venture "absolutely needed a back hoe and dump truck and probably needed an air compressor and jack hammer to hammer out concrete and asphalt." He speculated that the joint venture "probably" had all of this equipment and would not have to rent it.

With respect to the Equipment Lease, Mr. Wattenbarger testified that performance of the subcontract would not require "those items of heavy equipment." He testified that the joint venture would not need the directional drill because "[a]ll of the work requiring specialized drilling equipment had already been done by Golden State Utilities." He further testified that the Vacmaster vacuum excavator included in the Equipment Lease was not necessary because a vacuum excavator is used for horizontal drilling, whereas the joint venture would only need to dig vertical holes for the placement of hand holes and manholes. While Mr. Wattenbarger conceded that the joint venture might have need for an air compressor as included in the Equipment Lease, his "best guess" was that the joint venture "already owned one or rented one." With respect to the Caterpillar track excavator included in the Equipment Lease, Mr. Wattenbarger testified that the joint venture could perform the subcontract without it, if the joint venture already had a back hoe.

Mr. Wattenbarger testified that, based upon his review of material with respect to the subcontract produced in discovery by Golden State Utilities, Golden State Utilities terminated the subcontract after the joint venture cut a large feeder fiber optic cable while performing work on the subcontract. Golden State

14

Utilities then "back charged" the joint venture $15,000 to make repairs to the severed fiber optic cable. To substantiate this testimony, Mr. Wattenbarger further testified that he had reviewed Mr. Vance's bankruptcy schedules and that Mr. Vance had listed Golden State Utilities as a creditor with a $15,000 claim.

When asked for his opinion of the truth of Mr. Thomas's representation to Mr. Parrish that he needed to borrow $14,620 to pay for a bond for one of his jobs, Mr. Wattenbarger prefaced his testimony with the statement: "It is hard for me to say without more information." He then speculated that the amount seemed high for a bond, unless it was for a very large job. He concluded that he had seen nothing in the materials produced by Mr. Thomas in discovery to establish that Mr. Thomas had engaged in any large jobs during 2008. On that basis, Mr. Wattenbarger opined that Mr. Thomas had no reason or purpose to obtain a surety bond.

3. <u>Declaration of Valean Watson ("Watson Declaration")</u>

Mr. Watson had been a practicing attorney since 1979, and was licensed to practice law in California. Mr. Watson opined that the Joint Venture Agreement between Mr. Thomas and Mr. Vance was prepared without the assistance of legal counsel, and he pointed out numerous deficiencies in its terms. He further opined that although an addendum to the Joint Venture Agreement refers to funds provided by Mr. Parrish as amounts invested, the use of the term "invested" did not make Mr. Parrish an investor. The Joint Venture Agreement stated that "[t]he exclusive purpose of the Venture will be: Construction of the 39.5 Qwest Fiber Job in Sacramento, CA." Based

15

on this clause, Mr. Watson opined that it "seem[ed] reasonable to believe that [Mr. Thomas and Mr. Vance] were representing to [Mr. Parrish] that they had a large, lucrative job and that they obviously wanted him to believe that."

Mr. Watson similarly opined that the Equipment Lease had serious deficiencies with respect to its terms, and that he would have advised Mr. Parrish to avoid the transaction had he been consulted prior to Mr. Parrish making the Equipment Loan. Mr. Watson testified: "As for the overall force and effect of the [Equipment Lease], I believe that it is unfortunate evidence that [Mr. Thomas] sought to borrow a large sum of money from [Mr. Parrish] without any reasonable intention of paying it back."

4. <u>Declaration of Terry Magee ("Magee Declaration")</u>

Mr. Magee was asked by Mr. Parrish to "validate" serial numbers as described in the Equipment Lease. In order to do so, Mr. Magee went to the local Ditch Witch dealer in Corona, California, on January 24, 2011. With respect to the 2002 Ditch Witch JT920L Directional Drill, the dealer had none in stock or on the premises. Mr. Magee saw several trenchers and other specialized equipment manufactured in 2002, and noted that the serial numbers "looked nothing like the number represented in the [Equipment Lease]." The serial numbers on the trailers for several items of Ditch Witch products had serial numbers with a similar scheme as contained in the Equipment Lease. Mr. Magee then concluded that the Ditch Witch serial number in the Equipment Lease is for a trailer, not for a Directional Drill or any other machinery.

16

Mr. Magee then went to the local Caterpillar dealer in Foothill Ranch, California, where he inspected a 2007 Caterpillar 302.5 mini excavator and noted its product ID number (CAT 302.5 CJGBB02509), serial number (0141189), and arrangement number (2433064).

C.   Mr. Thomas's Evidentiary Objections

On February 8, 2011, Mr. Parrish served his direct testimony declarations on Mr. Thomas, together with his proposed exhibits and proposed Unilateral Pre-Trial Order.  On February 14, 2011, Mr. Thomas objected to Mr. Parrish's proposed exhibits as follows:

Exhibit 1, the Joint Venture Agreement, because it was a document between Mr. Thomas and Mr. Vance and had no relevance to proof of fraud in the case;

Exhibit 4, the Equipment Lease, because it was not relevant and was voided by an oral agreement between Mr. Parrish and Mr. Thomas in 2008;

Exhibit 7, the Addendum to the Lease Agreement, because it was not relevant and was voided by an oral agreement between Mr. Parrish and Mr. Thomas in 2008;

Exhibit 9, the addendum to the Joint Venture Agreement, because (1) it was a private document between Mr. Thomas and Mr. Vance, (2) it had no relevance to proof of fraud in the case, and (3) Mr. Parrish's interpretations of it are not relevant where he was not a principle to the agreement;

Exhibit 10, an Affidavit of Mr. Vance, because Mr. Vance was not listed as a witness for Mr. Parrish and cannot testify to its authenticity.

As previously noted, Mr. Thomas filed the Exclusion Motion. He separately objected to Mr. Parrish's witness declarations in his opposition to Mr. Parrish's proposed Unilateral Pre-Trial Order.

Mr. Thomas objected to the Wattenbarger Declaration on the bases that (1) Mr. Parrish did not provide Mr. Thomas with an expert

17

witness report as required by Civil Rule 26, (2) Mr. Wattenbarger's qualifications as an expert were suspect because Mr. Wattenbarger received his licence from the California State License Board in June of 2010, (3) Mr. Wattenbarger had no direct knowledge about the case, and (4) Mr. Thomas had not had an opportunity to depose Mr. Wattenbarger regarding any previous expert testimony he may have given or how much Mr. Parrish was paying for his services.

Mr. Thomas objected to the Magee Declaration on the basis that Mr. Magee had been acting as Mr. Parrish's legal counsel for the past two years, had written all legal documents for Mr. Parrish in the case to date, and held a law degree but could not pass the California Bar Exam. Mr. Thomas asserted that Mr. Magee's testimony about construction equipment serial numbers was "very suspect," and said nothing about proof of fraud in the case.

Finally, Mr. Thomas objected to the Watson Declaration on the basis that most of Mr. Watson's testimony concerned the intent Mr. Thomas and Mr. Vance had in their minds when they wrote the Joint Venture Agreement, something that Mr. Watson could not possibly know.

D.   The Trial

At the Trial, the bankruptcy court denied both the Dismissal Motion and the Exclusion Motion. In ruling on the Exclusion Motion, the bankruptcy court stated: "I'm going to err on the side of just letting people talk . . . I'll . . . deny the motion to exclude the proposed witnesses and [the testimony] will be worth whatever it is worth." Tr. of Feb. 23, 2011 Trial at 4:1-5.

Mr. Thomas declined to cross examine Mr. Parrish's witnesses on their declarations after the bankruptcy court explained that it was Mr. Parrish's burden to prove his claim by a preponderance of the evidence.

The record of the Trial reflects that a recess then was taken at the request of the Clerk, in order to "distribute" the trial exhibit books, an act which had been "overlooked" by the Clerk. When the Trial resumed, neither the bankruptcy court nor the parties made any reference to the trial exhibit books. Instead, the bankruptcy court clarified that Mr. Thomas would not cross-examine Mr. Parrish's witnesses on the submitted declarations. Mr. Thomas then stated that he had no further testimony to offer on defense.

Thereafter, the following colloquy took place between the bankruptcy court and Mr. Parrish:

THE COURT: It's your burden. So, now it's up to you. What would you like to do now?

MR. PARRISH: We can hear all the witnesses.

THE COURT: You can't. Direct is only done by declaration.

MR. PARRISH: Right, right. Okay.

THE COURT: Mr. Thomas does not want to cross examine. So, they won't be on the stand.

MR. PARRISH: Okay. Well, I guess we'll – we could leave it – I didn't expect this to be this quick.

THE COURT: All direct testimony is by declaration.

MR. PARRISH: I know.

THE COURT: All we do here is cross examination.

MR. PARRISH: Right. Well, if the witnesses don't – can't

19

be heard now then –

THE COURT: Well, they were heard by declaration.

MR. PARRISH: Right, right. I guess I can just give it to your Honor then. I'm not sure where – I mean I can testify. I mean all of us but you're saying –

THE COURT: Did you do your direct testimony by declaration?

MR. PARRISH: Yes, I did.

THE COURT: And Mr. Thomas is not going to do any cross examination. That's how we do it.

MR. PARRISH: Okay. I know. I understand that. So, I guess the case is what it is then. So, you know, so I guess we leave it to your Honor to make a decision. I'm not sure what else to say. I can't provide any more than what the declarations say. So, that's it. We went to a lot of work on it.

THE COURT: Do you want to say anything? You can say anything further you'd like to say in argument, but the declarations are the direct testimony.

MR. PARRISH: Right, right. Basically, the feeling is that they basically solicited money from me under false pretenses, and they fully intended to declare bankruptcy. So, that's pretty much my summation. That covers most everything. There's a long list of exhibits that prove my point, as well as my expert – one of them is an expert witness testimonies [sic]. It's all in there. . . .

Tr. of Feb. 23, 2011 Trial at 6:10-7:25.

At the conclusion of argument, the bankruptcy court ruled:

These are very difficult cases to prove because unless frankly Defendant gets on the stand and admits – it gets that close. There has to be so much circumstantial evidence of intent to defraud or an omission that these are really difficult cases to prosecute. . . . Unfortunately for the Plaintiff, the – I don't see the level that we need in order to give a nondischargeability of the judgment because you have to prove by the preponderance of the evidence, and that's a fairly high standard.

20

> You also have to prove – I'm going to go through the elements, a representation known to be false with intent to harm the creditor, justifiable reliance and proximate cause. Based on what I've seen, I can't find all of those have happened. So, I'm going to enter judgment in favor of the Defendant. . . . I can't find that all those elements from the In re Tallant case have been met. It is a high burden of preponderance of the evidence.

Id. at 9:4-25.

Mr. Parrish expressed concern that the standard of proof was higher than he had thought. To explain how difficult it is to prove non-dischargeability, the bankruptcy judge recited the facts of the only two non-dischargeable judgments she had obtained as a lawyer:

> One was a doctor who was billing on dead people, billed the government for work done on dead people. That was pretty easy to prove because he knew they were dead and he wasn't like a coroner. The other one was somebody on an Indian reservation who was operating an illegal dump that was killing people. It's one of those that the level is so high it can be very difficult to get a nondischargeability judgment.

Id. at 10:8-15.

In its Judgment After Trial ("Judgment") entered on February 24, 2011, the bankruptcy court stated:

> Direct Testimony was presented by Declaration pursuant to the [Trial Procedures Order]. The Defendant elected not to cross-examine the Plaintiff's witnesses and the Defendant did not provide any testimony or witnesses. The parties also presented Exhibit Binders to the Court but did not ask to submit any of the Exhibits into evidence. . . .
> The Court finds that Plaintiff did not meet the elements of 11 U.S.C. § 523(a)(2) by a preponderance of the evidence.

Mr. Parrish timely appealed the Judgment.

21

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I).  We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

A.  Whether the bankruptcy court made sufficient factual findings pursuant to Rule 7052.

B.  Whether the bankruptcy court abused its discretion in not admitting Mr. Parrish's exhibits into evidence.

C.  Whether the bankruptcy court erred in determining that Mr. Parrish did not prove by a preponderance of the evidence that his claim should be excepted from discharge under § 523(a)(2)(A).

## IV. STANDARDS OF REVIEW

The question of dischargeability of a debt presents mixed issues of fact and law, which we review de novo.  Honkanen v. Hopper (In re Honkanen), 446 B.R. 373, 378 (9th Cir. BAP  2011) (citing Miller v. United States, 363 F.3d 999, 1004 (9th Cir. 2004)).

Whether there has been proof of an essential element of a cause of action under § 523(a)(2)(A) to except a debt from discharge is a factual determination reviewed for clear error.  Anastas v. Am. Sav. Bank (In re Anastas), 94 F.3d 1280, 1283 (9th Cir. 1996).  Clear error exists when, on the entire evidence, the reviewing court is left with a definite and firm conviction that a mistake was committed.  Oney v. Weinberg (In Re Weinberg), 410 B.R. 19, 28 (9th Cir. BAP 2009).

We review the bankruptcy court's evidentiary rulings for abuse of discretion.  Am. Exp. Related Servs. Co. v. Vinhee (In re

22

Vinhee), 336 B.R. 437, 443-44 (9th Cir. BAP 2005). Evidentiary rulings will be reversed only if the error more likely than not affected the verdict. Henry v. Lehman Commercial Paper, Inc. (In re First Alliance Mortg. Co.), 471 F.3d 977, 998 (9th Cir. 2006). We may affirm the bankruptcy court on any basis fairly supported by the record. Wirum v. Warren (In re Warren), 568 F.3d 1113, 1116 (9th Cir. 2009).

We apply a two-part test to determine whether the bankruptcy court abused its discretion. United States v. Hinkson, 585 F.3d 1247, 1261-62 (9th Cir. 2009)(en banc). First, we consider de novo whether the bankruptcy court applied the correct legal standard to the relief requested. Id. Then, we review the bankruptcy court's fact findings for clear error. Id. at 1262 & n.20. We must affirm the bankruptcy court's fact findings unless we conclude that they are "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" Id. at 1262.

V.   DISCUSSION

A discharge under section 727 . . . of [the Bankruptcy
Code] does not discharge an individual debtor from any
debt -
. . .

(2) for money, property, services, or an extension,
renewal, or refinancing of credit, to the extent obtained
by -
    (A) false pretenses, a false representation, or actual
fraud, other than a statement respecting the debtor's or
an insider's financial condition. . . .

Section 523(a)(2)(A). The elements for establishing that a debt is nondischargeable under § 523(a)(2)(A) are well established by Ninth

23

Circuit authority.

> The Ninth Circuit employs a five-part test for determining when a debt is non-dischargeable under § 523(a)(2)(A). The creditor must show: (1) that the debtor made the representations; (2) that the debtor knew they were false; (3) that the debtor made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on the statements; (5) that creditor sustained damages as the proximate result of the representations.
> In re Britton, 950 F.2d 602, 604 (9th Cir. 1991).

Cowen v. Kennedy (In re Kennedy), 108 F.3d 1015, 1018 n.2 (9th Cir. 1997). In particular, the reliance element is based on "justifiable" reliance, that is, "whether the falsity of the representation was or should have been readily apparent to the individual to whom it was made." 4 Collier on Bankruptcy ¶ 523.08[1][d] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2011). Mr. Parrish bore the burden of proving, by a preponderance of the evidence, each of the elements of his claim for relief under § 523(a)(2)(A). Grogan v. Garner, 498 U.S. 279, 291 (1991).

In its Judgment, the bankruptcy found that Mr. Parrish "[had not met] the elements of § 523(a)(2)(A)] by a preponderance of the evidence." On appeal, Mr. Parrish challenges this finding on three grounds: (1) this "finding" of the bankruptcy court was not specific as required pursuant to Rule 7052; (2) the bankruptcy court abused its discretion when it failed to consider the exhibits Mr. Parrish had presented at Trial; and (3) the bankruptcy court erred when it determined Mr. Thomas's debt to Mr. Parrish was not excepted from discharge.

I.    The Bankruptcy Court's Findings

Civil Rule 52(a) provides:  "In an action tried on the facts

24

without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Civil Rule 52 is applicable in bankruptcy adversary proceedings pursuant to Rule 7052.

In this case, Mr. Parrish contends that the bankruptcy court's findings were so limited that it is not clear what he failed to prove. He also suggests that the bankruptcy court applied an incorrectly high legal standard under the label "preponderance of the evidence." We agree that the bankruptcy court's characterization of Mr. Parrish's burden of proof as "very high," especially in light of the examples of extreme behavior which the bankruptcy court cited as required to meet the preponderance of the evidence standard in nondischargeability cases, raises great concern as to whether the bankruptcy court applied the correct standard of proof.

> The burden of showing something by a "preponderance of the evidence," the most common standard in the civil law, "simply requires the trier of fact 'to believe that the existence of a fact is more probable than its nonexistence before [it] may find in favor of the party who has the burden to persuade the [jury] of the fact's existence.'" Concrete Pipe & Prods. of Cal. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 622, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (quoting In re Winship, 397 U.S. 358, 371-72, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring) (citation omitted)).

Costa v. Desert Palace, Inc., 299 F.3d 838, 848 (9th Cir. 2002).

The manner of the bankruptcy court's colloquy with Mr. Parrish calls into question whether the bankruptcy court construed the preponderance of the evidence standard as something more onerous

25

than establishing that it was more probable than not that Mr. Thomas had committed fraud. It is likely that in making its remarks, the bankruptcy court meant to convey to Mr. Parrish only that proving intent by circumstantial evidence is inherently difficult. However, the bankruptcy court should have taken greater care in its articulation of the evidentiary standard, particularly in a case involving a pro se litigant, to ensure that it clearly stated what that standard is. Had more care been taken in the articulation of the standard of proof, Mr. Parrish may not have felt compelled to appeal the ultimate result.

As a reviewing court, we find this appeal further complicated by the extremely limited nature of the findings. In lieu of clear findings, the bankruptcy court merely stated that Mr. Parrish did not prove the elements, correctly identified by the bankruptcy court, of a § 523(a)(2)(A) claim for relief by a preponderance of the evidence. Under Ninth Circuit law, however, "where a full understanding of the issues can be reached without the aid of findings, this court is not required to remand the judgment because of the district court's failure to comply fully with [Civil] Rule 52(a)." Alpha Distributing Co. of Ca. v. Jack Daniels Distillery, 454 F.2d 442, 453 (9th Cir. 1972). "The failure of the trial court to comply with [Civil] Rule 52 . . . does not demand reversal 'if a full understanding of the question presented may be had without the aid of separate findings.'" Magna Weld Sales Co., Inc. v. Magna Alloys & Research Pty. Ltd., 545 F.2d 668, 671 (9th Cir. 1976). We ultimately are charged in this appeal to determine whether, on the

26

entire evidence, we are left with a definite and firm conviction that the bankruptcy court erred in its determination that Mr. Parrish failed to establish each element of a claim for relief under § 523(a)(2)(A). Accordingly, we see no need to remand the case to the bankruptcy court for further findings.

II. The Bankruptcy Court's Evidentiary Rulings

Before we can evaluate whether the evidence that was before the bankruptcy court was sufficient to meet Mr. Parrish's burden of proving his § 523(a)(2)(A) claim for relief by a preponderance of the evidence, we first must address Mr. Parrish's issue that the bankruptcy court abused its discretion in failing to admit his exhibits into evidence.

Bankruptcy courts may require all testimony and evidence to be submitted in writing prior to trial. Lee-Benner v. Gergely (In re Gergely), 110 F.3d 1448, 1452 (9th Cir. 1997). In this case, the Trial Procedures Order instructed the parties that "[e]xhibits referenced in any declaration should be offered into evidence when the declaration is offered into evidence."

Basic principles of evidence law require that a party offer an exhibit into evidence if that exhibit is to be admitted. See 1 McCormick on Evidence § 51. Conversely, when a party fails to offer an exhibit for admission, the exhibit fails to become evidence. See In re Vargas, 396 B.R. 511, 519 (Bankr. C.D. Cal. 2008)("[Party] declined to move the admission of any of these documents . . . . Thus, there is no evidence . . . before the court."); In re Osborne, 257 B.R. 14, 21 (Bankr. C.D. Cal. 2000)("It

27

is well settled that neither statements of counsel, nor exhibits not admitted into evidence, are evidence.").

The requirement that a party offer evidence is not an empty ritual; it ensures that the opposing party will have an opportunity to object to the proffered evidence, should he or she so choose. See McCormick, supra. A party seeking to admit an exhibit into evidence should "tender[] the exhibit to the judge by stating, 'Plaintiff offers this (document or object, describing it), marked "Plaintiff's Exhibit No." for identification, into evidence as Plaintiff's Exhibit No. 2.'" Id.

When a pretrial order establishes a procedure for the admission of evidence, and a party fails to follow that procedure, we will not find that the bankruptcy court abused its discretion in denying the admission of evidence. In re Gergely, 110 F.3d at 1448; see, e.g., In re Herb Goetz & Marlen Horn Assoc., Inc., 120 F.3d 268 (9th Cir. 1997).

At the Trial, Mr. Parrish's four declarations were admitted as direct testimony. In the Parrish Declaration, Mr. Parrish referred to exhibits variously as being "marked," "attached," "offered," or "presented." Mr. Parrish also submitted to the bankruptcy court Exhibit Binders containing all exhibits referred to in the Parrish Declaration.

The record reflects that Mr. Parrish was aware that Mr. Thomas refused to stipulate to the admission of any of his exhibits. He further was aware that Mr. Thomas had raised specific objections to at least five of his exhibits. The Trial Procedures Order spelled

28

out what was necessary to get exhibits into evidence in that situation. The burden was on Mr. Parrish to obtain a ruling on the admission of his exhibits. It is clear from the record that he did not understand that burden. At most, Mr. Parrish marked and tendered the exhibits. The transcript of the Trial reflects that Mr. Parrish never offered or asked to submit his exhibits into evidence; nor did he make any other statements to that effect.

Typically, a litigant's failure to understand the process does not translate into an abuse of discretion by the bankruptcy court when exhibits are not admitted into evidence. Here, however, we believe that the actions of the bankruptcy court contributed to the confusion surrounding the admission of Mr. Parrish's exhibits.

The bankruptcy court considered the Dismissal Motion and the Exclusion Motion together at the commencement of the Trial. Mr. Parrish had opposed the dismissal motion, in part by complaining about Mr. Thomas's refusal to cooperate by stipulating to the authenticity of documents. In ruling on Mr Thomas's Exclusion Motion, the bankruptcy court stated "I'm going to err on the side of just letting people talk . . . I'll . . . deny the motion to exclude the proposed witnesses and [the testimony] will be worth whatever it is worth." With respect to the Dismissal Motion, the bankruptcy judge stated only that "I'm going to deny that at this point." In our view, particularly in light of what followed, Mr. Parrish reasonably could have believed that all of his evidence had been made a part of the record.

The Trial commenced immediately thereafter, and was

orchestrated by the bankruptcy court:

> So, then we go onto the trial. We do have declarations from the witnesses, and to the extent, Mr. Thomas, you want to do any cross examination you can call them and cross examine them.

Tr. of Feb. 23, 2011 Trial at 4:9-12. After the bankruptcy court suggested that Mr. Thomas need not cross-examine Mr. Parrish's witnesses ("frankly, you don't really have to do all that"), because Mr. Parrish had the burden of proof, the bankruptcy court took a recess to distribute the exhibit books. Once back on the record the bankruptcy court made no reference to the fact that the exhibit books had been "distributed" or what that meant.[9] Instead, the bankruptcy court explained only that "[i]t will be left with their declarations." In light both of the manner in which the exhibit books were handled and the fact that the Parrish Declaration identified and relied on each exhibit in the exhibit books, we believe that Mr. Parrish reasonably could have believed that in stopping the Trial and distributing the exhibit books, the bankruptcy court could effectively have been recognizing the exhibits as part of the record at Trial.

In its final colloquy with Mr. Parrish, the bankruptcy court stated "[a]ll we do here is cross examination," and "[y]ou can say anything further you'd like to say in argument, but the declarations are the direct testimony." As a pro se litigant, and in the context

---

[9] The bankruptcy court made no mention of the lack of exhibits in the record until the day following the Trial when the Judgment was entered.

30

of the extremely abbreviated nature of the proceedings, it is not surprising that Mr. Parrish might have taken that statement literally and believed as a consequence there was nothing more he could do or needed to do to present his evidence.

On this record, we conclude that the bankruptcy court may have abused its discretion, because the proceedings, as they unfolded, did not alert Mr. Parrish that he was required to do more to have his exhibits admitted into evidence. This conclusion does not require that we reverse the bankruptcy court's Judgment, however, because, in our de novo review of the record, including the exhibits, we independently determine that Mr. Parrish did not meet his burden of proof with respect to the elements of his § 523(a)(2)(A) claim for relief.

III. Mr. Parrish Did Not Prove a § 523(a)(2)(A) Claim for Relief By a Preponderance of the Evidence

The evidence before the bankruptcy court in support of Mr. Parrish's claim for relief consisted entirely of the four declarations. Mr. Parrish contends on appeal that the evidence established: (1) that Mr. Thomas represented that he was carrying out a large 39.5-mile fiber optic cable project; (2) that the representation was necessarily false given the actual, much more modest nature of the subcontract; (3) that Mr. Thomas had to know that those representations were false, given his work on an actual, more modest project; (4) by knowingly making false representations prior to borrowing money, Mr. Thomas necessarily made the representations with the intent to deceive Mr. Parrish and to

31

procure loans from him; and (5) Mr. Parrish justifiably relied on Mr. Thomas's representations in deciding to make the loans, and was damaged as a result. As we discuss below, Mr. Parrish's witness declarations do not constitute adequate proof of at least some of these assertions.

The Magee Declaration. It appears that Mr. Parrish may have intended the testimony in the Magee Declaration to establish that Mr. Thomas never intended to purchase the Ditch Witch Directional Drill or the Caterpillar mini excavator even though Mr. Parrish alleges Mr. Thomas borrowed funds specifically for that purpose. Leaving aside the fact that the Equipment Lease never was admitted into evidence, the Magee Declaration proves nothing other than that Mr. Magee went to two equipment dealerships and looked at product numbers and serial numbers. The Magee Declaration is good only to establish what he saw. It does not provide evidence as to what the product numbers and serial numbers mean in connection with the equipment specified in the Equipment Lease. Useful evidence on this point could have come from the equipment dealers themselves. If Mr. Parrish wanted to prove that there is no such thing as a 2002 Ditch Witch JT920L Directional Drill with the serial number included on the Equipment Lease, he should have provided the testimony of a Ditch Witch representative, supported by appropriate documentary evidence.

The Watson Declaration. Predominant in Mr. Watson's testimony was his opinion that the Joint Venture Agreement and the Equipment Lease prepared by Mr. Thomas were so legally deficient that they

32

could only have been created to induce Mr. Parrish to loan money to Mr. Thomas. We agree with Mr. Thomas that while Mr. Watson may have been able to testify as to his opinion of the legal sufficiency of the Joint Venture Agreement and the Equipment Lease, there was no basis upon which Mr. Watson could testify as to Mr. Thomas's intent when Mr. Thomas created the documents. The Watson Declaration provides no evidence on any element in the § 523(a)(2)(A) claim for relief.

The Wattenbarger Declaration. Mr. Wattenbarger testified that he had reviewed the joint venture's subcontract with Golden State Utilities. Unfortunately, the bankruptcy court did not have an opportunity to review the alleged subcontract. With respect to the subcontract, not only did Mr. Parrish fail to "offer" it, or a copy of it, into evidence, he neither marked it nor included it in his Exhibit List. Federal Rule of Evidence 1002 provides: "To prove the content of a writing . . . , the original writing . . . is required, except as otherwise provided in these rules or by Act of Congress." Federal Rule of Evidence 1003 provides that "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Because the subcontract existed, Mr. Wattenbarger's testimony concerning it constituted hearsay. Even assuming that the bankruptcy court could consider Mr. Wattenbarger's testimony with respect to the subcontract, that testimony does not establish what it appears Mr. Parrish hoped that

33

it would.

First, to the extent that Mr. Parrish intended to establish that Mr. Thomas never intended to repay the loans Mr. Parrish made in reliance on the fiber optic job, Mr. Wattenbarger's testimony does not prove that the proceeds from the subcontract would be insufficient to repay the loans. Mr. Wattenbarger testified that the subcontract did not state an exact quantity of work to be performed; instead, it stated the amount of work was "to be determined," and it provided a unit price for each item to be done. There is no evidence anywhere in the record to suggest what the ultimate scope of the subcontract was. In fact, Mr. Wattenbarger testified, again without compliance with the Federal Rules of Evidence regarding writings, that the subcontract ended not because it expired by its terms, but because it was terminated unilaterally by Golden State Utilities as the result of an alleged mishap by the joint venture that caused substantial damage to the fiber optic cable.

Second, to the extent that Mr. Parrish intended to establish through Mr. Wattenbarger's testimony that Mr. Thomas misrepresented the amount he needed to borrow to perform the subcontract, Mr. Wattenbarger's testimony is speculative, even to the point of guessing what equipment the joint venture owned. Mr. Wattenbarger's opinion that Mr. Thomas did not need the amount borrowed also was conditioned on unknown and often surprising assumptions, such as the assumption that the joint venture could have obtained supplies on credit at contractor warehouses, the joint venture could have

34

delayed wage payments to employees for a week or two, or that the joint venture might receive job related costs in advance from Golden State Utilities. Mr. Wattenbarger's implied suggestion that these alternatives eliminated the joint venture's need for cash makes no sense; at most, they would defer the joint venture's need for cash.

The Parrish Declaration. Through his testimony, Mr. Parrish establishes that he sought out Mr. Thomas as someone who might want to borrow money from him. Mr. Parrish wanted to make money on funds he could access through his home equity credit line. Mr. Parrish trusted Mr. Thomas because he trusted Mr. Mesa, the mutual business associate who had suggested that Mr. Thomas might need a loan. Mr. Parrish testified that in making the loans for the fiber optic job he relied upon (1) the $40,000 and equipment being contributed by Mr. Thomas and Mr. Vance to the joint venture, (2) the fact that both Mr. Thomas and Mr. Vance were licensed contractors, and (3) the promises of Mr. Thomas and Mr. Vance to repay the loans.

In order to prevail on his § 523(a)(2)(A) claim for relief, Mr. Parrish was required to prove each element articulated by <u>Britton</u> by a preponderance of the evidence. <u>In re Britton</u>, 905 F.2d at 604. The absence of proof of even one element is sufficient to defeat his claim.

There is nothing in the Parrish Declaration that might establish that Mr. Parrish justifiably relied on any representation Mr. Thomas might have made that the joint venture was the general contractor on the fiber optic job. Further, there is no evidence in the record that Mr. Parrish justifiably relied upon any

35

representation Mr. Thomas may have made which might relate to the value of the joint venture's work in connection with the fiber optic job. Mr. Parrish was willing to loan nearly $200,000 to a person known to him through a mutual acquaintance, in part because he trusted that mutual acquaintance. On that basis, the record does not establish that it is more likely than not that Mr. Parrish relied on any representation made by Mr. Thomas.

On the issue of intent, Mr. Parrish himself presented evidence at Trial that would support a finding that Mr. Thomas intended to repay the loans to Mr. Parrish. First, Mr. Thomas made payments, albeit limited, over a period of five months. The partial repayment of the loans supports an inference that Mr. Thomas intended to repay Mr. Parrish, not defraud him. See Advanta Nat'l Bank v. Kong (In re Kong), 239 B.R. 815, 822 (9th Cir. BAP 1999) (citing Anastas v. Am. Savings Bank (In re Anastas), 94 F.3d 1280, 1287 (9th Cir. 1996)). Furthermore, according to Mr. Wattenbarger's testimony, the joint venture lost the subcontract because it damaged QWEST's fiber optic cable. That testimony likewise supports an inference that rather than intending to defraud Mr. Parrish, Mr. Thomas simply lost the ability to repay him.

Based upon our review of the record, and applying a preponderance of the evidence standard, we are not left with a definite and firm conviction that the bankruptcy court made a mistake in determining that Mr. Parrish did not meet his burden of proving his claim for relief under § 523(a)(2)(A). We find no reversible error.

36

## VI.  CONCLUSION

Mr. Parrish failed to carry his burden of proving by a preponderance of the evidence the elements required to support a judgment in his favor pursuant to § 523(a)(2)(A).

We AFFIRM.

37