**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: ) | BAP No. NC-14-1025-TaPaJu |
| ) | |
| CHRISTOPHER MICHAEL COTE, ) | Bk. No. 12-53464 |
| ) | |
| Debtor. ) | Adv. Pro. No. 12-05160 |
| _____ ) | |
| CHRISTOPHER MICHAEL COTE, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | MEMORANDUM[*] |
| ) | |
| AL V., INC., ) | |
| ) | |
| Appellee. ) | |
| _____ ) | |

Argued and Submitted on February 19, 2015
at San Francisco, California

Filed - July 27, 2015

Appeal from the United States Bankruptcy Court
for the Northern District of California

Honorable Stephen L. Johnson, Bankruptcy Judge, Presiding

_____

Appearances:     Charles Alex Naegele argued for Appellant
Christopher Michael Cote; Mark B. Freschi argued
for Appellee Al V., Inc.

_____

Before: TAYLOR, PAPPAS, and JURY, Bankruptcy Judges.

---

[*]     This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1(c)(2).

**INTRODUCTION**

Chapter 7[1] debtor Christopher Cote appeals from the bankruptcy court's judgment after trial awarding damages of $490,883.85 to appellee Al V., Inc. ("Contractor") and declaring this debt excepted from discharge under § 523(a)(2)(A).

Contractor sought a nondischargeable judgment based on alleged fraud relating to a construction contract between it and Cote. Its alleged damages consisted primarily of amounts in excess of its right to recovery under the construction contract at its formation.

The bankruptcy court found that Cote intentionally deceived Contractor by knowingly misrepresenting his ability to perform under the construction contract. It then determined that this proximately caused damages to Contractor. We determine that these findings were clearly erroneous.

The record is inconsistent with a determination that Cote lacked necessary funding at initiation of the construction contract. It also does not support the conclusion that the damages awarded were contemplated by the construction contract at formation or that they were completely recoverable under the construction contract as thereafter amended. Therefore, we REVERSE.

**FACTS**

**The Agreements Between Cote and Contractor.** Contractor, a licensed general contracting company owned by Al Valles and his

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

- 2 -

wife,[2] entered into a construction contract with Cote's development company[3] to build 10 homes ("Phase I") of a planned 18-home solar-powered residential subdivision called Hanna Square in Gilroy, California.[4]

At the beginning of the relationship, the parties signed a Letter of Understanding & Confidentiality Agreement dated June 4, 2007 (the "Confidentiality Agreement"). Cote agreed to provide financial, technical, and management data to Contractor, which included bank construction loan approval letters and banking data. Valles testified at trial that this Confidentiality Agreement somehow prohibited him from contact with Cote's construction lender.

The parties also entered into a Construction Services Contract ("Initial Contract") along with an Addendum to and Modification of Construction Services Contract ("Addendum," and together with the Initial Contract, the "Construction Contract").[5] Contractor later argued that he was fraudulently

_____

[2] Valles had been in the contracting business more than 20 years and had built over 150 custom homes and three commercial buildings; he primarily worked as an owner-builder and not as a third party contractor.

[3] Cote was the sole owner. At no point did Cote argue that he was not the proper defendant. For simplicity, we refer to the development company and Cote hereinafter as "Cote."

[4] Cote's schedules disclosed that his employment for 21 years was as a Safari Guide and that he received $11,000.00 per month in gross income. The record suggests, however, that he may have developed at least one prior project.

[5] Each party admitted a copy of the Initial Contract into evidence at trial. Both copies contained identical text and contained signatures over the signature line for Valles and the initials "A.V." on every page. The handwritten dates differ

(continued...)

- 3 -

induced to enter into and to perform under this contract. The Construction Contract's terms, thus, are critical to the analysis, and we highlight the most relevant terms (or lack thereof) as follows:

1. The Construction Contract made clear that it did not provide for the payment of the cost of building the homes in Phase II. This necessarily excluded any of the Phase II "under roof" costs and certain site improvements. Instead, the Construction Contract provided that the parties would proceed to build the eight homes in Phase II within one year of execution of the Construction Contract if the sales of homes in Phase I were sufficient.

2. Contractor agreed to construct the 10 homes in Phase I for a maximum "under roof" price of $120.75[6] per square foot or a total of $1,929,585 ($120.75 multiplied by 15,980 total square feet). The Construction Contract, however, also contained numerous provisions that either required, under certain circumstances, or incentivized Contractor, in all events, to

(...continued)
between the copies. At trial, Valles testified that the signature on his exhibit was not his signature. But, he did not dispute his signature on the Initial Contract introduced into evidence by Cote. Aside from speculation in Contractor's closing argument, there was no further evidence or discussion regarding the disparity in signature.

[6] Valles testified at trial that when he was presented with the Initial Contract for execution at the title company, Cote tried to reduce the agreed building costs from $120.75 per square foot to $115 per square foot. Their agreement to $120.75 is contained in the Addendum. As later discussed, Contractor's theory of the case does not turn on whether $115 might have been sufficiently funded, but $120.75 was not; and Cote never disputed that he agreed to $120.75 per square foot for the under roof building costs when he entered into the Construction Contract.

- 4 -

construct the 10 homes at a lower cost.[7] Based on these provisions, Contractor was aware at the time that it entered into the Construction Contract of Cote's stated goal to have Phase I completed by January 1, 2008. There is no evidence that Contractor advised Cote that his goal was unreasonable.

3. The Construction Contract also provided for the payment of certain costs for site improvements and established $589,930 as the total maximum price for site improvements for both phases of Hanna Square. Contractor agreed to later provide the allocated cost of Phase I site improvements; there is no evidence in the record that it did so or that the parties ever agreed to a specific number. The bankruptcy court concluded that the agreed upon number for Phase I offsite improvements was $556,461; we disagree. The Initial Contract stated that this was the maximum amount payable for both Phase I and Phase II site improvements. The Addendum increased the site improvement budget for both phases to a maximum of $589,930. The bankruptcy

---

[7] First, the Construction Contract required Contractor to reduce the maximum payable under the agreement if it obtained reductions in amounts payable to sub-contractors through negotiations. Contractor guaranteed in the Construction Contract that such negotiations were ongoing. The Addendum also required a downward adjustment if Cote provided a WRAP insurance policy covering Contractor and all sub-contractors at Cote's expense. The record establishes that Cote provided insurance of some type.

Second, the Construction Contract obligated or incentivized Contractor to build the homes in Phase I quickly and to complete Phase I at a total cost below budget. Contractor agreed to identify "the most efficient economic means of achieving Developer's objective, which is to bring all homes to market and be sold before 1/1/08." Pl.'s Trial Ex. 1 at 3. Cote agreed to pay Contractor a bonus payment of 50% of all construction cost savings if the project completed below budget and a $50,000 bonus if the Contractor completed 8 of the 10 homes within four months of building permit issuance and the remaining 2 homes within five months of building permit issuance.

- 5 -

court's use of $556,461, thus, is not logical or supported by the record. In particular, this number was never mentioned by any party in testimony or in argument at the trial.

The record, however, does support some assumptions as to what Cote must or should have known regarding Phase 1 site improvements at the time of the Construction Contract.[8] The only other evidence regarding the site improvement cost for Phase I is a construction loan progress disbursement request including a cost allocation recap ("Disbursement Request"), identified as an exhibit to the construction loan, which budgeted $358,014 to bonded site improvements and $68,754 to non-bonded site improvements, for a total of $426,768 in budgeted site improvement costs. There is no evidence in the record that any other amount for allocated Phase I site improvements was discussed by Contractor and Cote prior to execution of the Construction Contract, reasonably contemplated

_____

[8] First, Cote had to assume that something, albeit less than $589,930, would be payable in relation to site improvements.

Second, Cote could not assume that simple division would provide the answer. The loan documents in the record budgeted bonded site improvements of $358,014 and made clear that the bonded site improvements related to both phases of the Hanna Square project. The bankruptcy court correctly assumed that Cote was familiar with his lender's assumptions and documents; he, thus, knew that he needed to pay the budgeted amount of the bonded site improvements when he entered into the Construction Contract.

Third, as the bankruptcy court correctly found, the Construction Contract did not relate to both Phase I and Phase II. Thus, it would not be reasonable for Cote to assume that he needed to pay for all the remaining site improvement expense through Phase I financing; for example, it is impossible to properly landscape a home that is not yet built. The loan documents used a budgeted amount of $68,754 for non-bonded site improvements. The record, thus, establishes that Cote must have known that he needed to pay for $426,768 of site improvements in connection with Phase I.

- 6 -

by Cote prior to execution of the Construction Contract, or ever provided by Contractor either before or after the Construction Contract.

4. Contractor agreed to receive payment of $39,500 from the sale of each home if it required payment in excess of any amounts detailed in the schedule of payments from United American Bank (the "Bank"). At trial, Contractor and Cote disagreed as to the intended meaning and effect of this provision.

5. Pursuant to the Addendum, Cote was responsible for certain expenses including those related to solar arrays and fill dirt.

6. The Construction Contract contained a confidentiality provision that repeated some paragraphs contained in the Confidentiality Agreement. As with the Confidentiality Agreement, Valles contended that this provision prohibited him from contact with Cote's construction lender.

7. The Construction Contract provided that Cote would pay Contractor in accordance with the Bank's "Construction Loan draw system schedule as described in the United American Bank Construction Loan Document." Pl.'s Trial Ex. 1 at 15. Further, Cote and Contractor agreed that all draw monies would be evaluated to confirm that the total monies paid corresponded with the total percentage of project completed as of the date the progress payment was requested and paid.

8. There was no provision for any award of attorney's fees or interest.

**Funding for Phase I Construction**. Cote obtained a

- 7 -

construction loan in the total amount of $3.8 million (the "Construction Loan") from the Bank. After payment of existing liens and other closing costs, there was approximately $2.6 million in Construction Loan proceeds. Contractor later argued that this amount was insufficient to pay amounts owed under the Construction Contract and, necessarily, that Cote knew it. The bankruptcy court ultimately agreed.

The record shows that the Bank also financed an additional $155,000.[9] The bankruptcy court, however, did not address this additional loan.

Valles testified at trial that, at the formation of the Construction Contract, Cote stated that he had additional funds available to him outside the Construction Loan. The record supports this statement as there was evidence that some construction costs were paid where the source of these payments, is unknown. The bankruptcy court did not address this evidence.

Cote obtained a bond insuring payment in relation to $358,014 of site improvements. The bond was effective; Contractor sued the bonding company and apparently the bonding company paid. The bankruptcy court did not address the bond.

While the parties disagreed about the meaning of the provision requiring payment from home sale proceeds, there was no evidence presented establishing that it was unreasonable for Cote to believe, when he signed the Construction Contract, that home sales would be sufficient to pay Contractor in full. The

---

[9] An unchallenged document admitted into evidence at trial (defendant's trial exhibit N) reflects that with the line of credit Cote's maximum credit from the Bank for costs payable during Phase I of the Hanna Square project was $3,955,000.

only evidence in the record was that the Bank valued the entire Hanna Square project at over $12 million, which left it with a healthy loan to value ratio of 31% at the time the parties entered into the Construction Contract. The bankruptcy court did not address this evidence.[10]

**Construction Loan Funding**. Valles also executed an Acknowledgment of Assignment, part of a form bank document titled Assignment of Construction Contracts dated July 11, 2007 ("Contract Assignment"). The Contract Assignment recited that Cote requested a $3,800,000 construction loan from the Bank. Contractor expressly acknowledged that it was familiar with the disbursement provisions of the Bank's loan documents, that the Bank's disbursement provisions were satisfactory, and that a change to the Construction Contract would not be effective unless Bank approved it.

Valles never disputed that he signed the Contract Assignment. He described it, however, as the document Cote produced to intentionally mislead Valles into believing that there was a full $3.8 million loan to cover construction costs for the project.

**Phase I Construction**. Once started, construction of Phase I proceeded with no payment problems until the sixth month. Contractor submitted monthly invoices to Cote. Cote then submitted monthly progress payment requests to the Bank.

---

[10] There is no evidence or argument in the record that Cote, Valles, or Bank anticipated the rapidly approaching real estate recession at the time of the Construction Contract and Construction Loan Agreement; unfortunately as Phase I of the Hanna Square project neared completion, the recession had arrived.

- 9 -

The Bank's construction auditor walked the project with Contractor's project manager and discussed the work and percentage completed. The Bank deposited the approved amounts drawn from the loan into Cote's account at the Bank. And, thereafter, Cote issued checks to Contractor, which paid its invoices in full. Indeed, on some occasions, the Bank's auditor did not approve the full amount requested by Contractor; when Cote paid these amounts in full, he did so with other funds.

During this time, Cote also utilized Construction Loan proceeds to pay other related construction costs. There is no evidence in the record, however, that he improperly utilized Construction Loan proceeds or received any payment for personal benefit.

Cote and Contractor also agreed to a few changes to the Construction Contract and executed formal change orders in the total amount of $175,502. Under these change orders, Cote agreed to pay Contractor on account of charges notwithstanding the maximums in the Construction Contract.

Then, in the sixth month (at which point Phase I was approximately 94% complete), Cote paid only part of Contractor's invoice, which brought total payments to Contractor up to $1,778,350. This was the last payment made by Cote to Contractor;[11] the relationship fell apart. Cote advised Contractor that he was out of money. His trial testimony and

---

[11] Valles testified at trial that Contractor continued work on the project and that its final invoice was dated February 28, 2008. He did not testify regarding the party for whom Contractor continued the work, even after Cote allegedly told him he had no more money. But, there is no dispute that Contractor continued the work.

the documentary evidence established, however, that at the time there was $536,501.79 in available credit under the Construction Loan. That the Bank later paid additional amounts to Contractor further evidenced that the Construction Loan was not then fully drawn. It appears instead that Cote was not able to immediately access remaining loan proceeds at the time of default — not that they did not exist.

The following month, Contractor issued a final invoice for over $1 million dollars, which included contract overages and profit thereon of over $447,879 – 19% more than the maximum amount stated in the Construction Contract. The same month, Contractor also filed a mechanic's lien and initiated a lawsuit against Cote, the Bank, the bonding company, and others; and, it filed a lis pendens against the Hanna Square property.

Contractor eventually settled[12] the litigation with the Bank and the bonding company; the settlement brought Contractor's receipts just shy of the maximum amount stated in the Construction Contract for construction of the Phase I homes plus the entire amount allocated by the Bank for site improvements. But, it did not cover the 19% overage amount. At trial, Contractor offered into evidence copies of authorized change orders to support only $175,502 of the overages.

---

[12] The settlement agreement was among the documents admitted into evidence by the bankruptcy court ("Settlement Agreement"). By its terms, it involved settlement of claims for construction work on **both** phases of Hanna Square. Neither the parties nor the bankruptcy court raised any issue on this point and we, therefore, mention it only in passing. There is no evidence in the record that Phase II homes were constructed; we assume the reference to Phase II is attributable to some Phase II site improvements.

**The bankruptcy and adversary proceeding.** Nearly one year after the settlement, Cote filed his chapter 7 bankruptcy petition. In August 2012, over five years after the parties entered into the Construction Contract, Contractor filed a complaint initiating the adversary proceeding seeking judgment and determination of nondischargeability under § 523(a)(2)(A) and (a)(2)(B). The complaint alleged that Cote falsely represented that he had a $3.8 million Construction Loan because the loan was actually funded in the principal amount of $2.1 million. It alleged that Cote knew the loan amount representation was false, knew the Construction Loan was insufficient, and knew the costs of construction were beyond Cote's ability to pay. The complaint alleged that Cote never intended to fully compensate Contractor as required under the Construction Contract but, rather, intended to deprive it of "money, property and services." Contractor asserted damages in the amount of $769,123.01 as a proximate result of Cote's alleged misrepresentations regarding his intent to pay and the sufficiency of funding.

The bankruptcy court held a one-day 6-hour timed trial[13] on December 3, 2013. The parties objected to virtually none of the documentary evidence, and the bankruptcy court admitted the numerous documents into evidence for all purposes; this included documents submitted without any explanatory testimony and

---

[13] We have exercised our discretion to review documents filed on the bankruptcy court's electronic docket in the Adversary Proceeding and in the main case. See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957-58 (9th Cir. 1989).

documents that appear incomplete or include unexplained notations. After trial, the bankruptcy court took the matter under submission and did not receive further briefing.

The bankruptcy court entered its Order Following Trial on First Amended Complaint Objecting to Discharge of Debtor ("Order After Trial") on January 3, 2014, as its findings of fact and conclusions of law. It found that Valles was not sophisticated in business. It found that "Cote misrepresented the amount of funds at his disposal to complete the Hanna Square project[]"; he did not have $3.8 million in the loan, as he told Contractor, because nearly $1 million was paid to holders of first and second deeds of trust; and he told the Bank maximum costs would be $2,041,636.55 – an amount less than the amount required by Contractor under the Construction Contract. Order After Trial at 11. The bankruptcy court found that "[d]ue to these differences, it appears the project ran out of money in January 2008, leaving [Contractor] unpaid." Id.

Cote timely appealed.[14]

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Whether the bankruptcy court erred in determining that a debt owed by Cote to Contractor was excepted from discharge

---

[14] Cote filed the notice of appeal after entry of the Order After Trial, but before the Judgment. Nonetheless, the appeal was timely. See Fed. R. Bankr. P. 8002(a)(2).

- 13 -

pursuant to § 523(a)(2)(A).

**STANDARD OF REVIEW**

Whether a claim is nondischargeable presents mixed issues of law and fact. Deitz v. Ford (In re Deitz), 760 F.3d 1038, 1042 (9th Cir. 2014). Mixed questions of law and fact are generally reviewed de novo. See Mathews v. Chevron Corp., 362 F.3d 1172, 1180 (9th Cir. 2004); In re Deitz, 760 F.3d at 1043. In the context of a dischargeability analysis, however, the bankruptcy court's factual findings are reviewed under the clearly erroneous standard. Candland v. Ins. Co. of N. Am. (In re Candland), 90 F.3d 1466, 1469 (9th Cir. 1996). Thus, whether a creditor proved an essential element under § 523(a)(2)(A) is a factual determination reviewed for clear error. Am. Express Travel Related Servs. Co., Inc. v. Vee Vinhnee (In re Vee Vinhnee), 336 B.R. 437, 443 (9th Cir. BAP 2005).

"Clearly erroneous review is significantly deferential, requiring that the appellate court accept the [trial] court's findings absent a definite and firm conviction that a mistake has been made." United States v. Syrax, 235 F.3d 422, 427 (9th Cir. 2000). The bankruptcy court's choice among multiple plausible views of the evidence cannot be clear error. United States v. Elliott, 322 F.3d 710, 714 (9th Cir. 2003). The deference owed to the bankruptcy court is heightened where its choice is based on the credibility of live witnesses. Rule 8013. A factual finding is clearly erroneous, however, if, after examining the evidence, the reviewing court "is left with the definite and firm conviction that a mistake has been

- 14 -

committed." Anderson v. City of Bessemer City, NC, 470 U.S. 564, 573 (1985) (internal citation omitted).

In general, contract interpretation is a question of law reviewed on a de novo basis. "This is particularly true where the intent of the parties is easily ascertainable from the clear and explicit language of the contract." U.S. v. 1.377 Acres of Land, 352 F.3d 1259, 1265 (9th Cir. 2003). If the bankruptcy court relies on extrinsic evidence in rendering its decision, however, its findings of fact are reviewed for clear error. See id. at 1264.

**DISCUSSION**

**A.    Exception to discharge**

A claim for denial of a discharge under § 523 is construed liberally in favor of the discharge and strictly against a person objecting to the discharge. Inst. of Imaginal Studies v. Christoff (In re Christoff), 527 B.R. 624, 629 (9th Cir. BAP 2015). A creditor objecting to the dischargeability of its claim bears the burden of proving, by a preponderance of the evidence, that the particular debt falls within one of the exceptions to discharge enumerated in section 523(a). Grogan v. Garner, 498 U.S. 279, 286-91 (1991).

To prevail on a claim under § 523(a)(2)(A), a creditor must establish the existence of five distinct elements: (1) the debtor made representations; (2) debtor knew the representations were false at the time he made them; (3) debtor made the representations with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on the representations; and (5) the creditor sustained the alleged loss

- 15 -

and damage as the proximate result of the representations having been made. Ghomesh v. Sabban (In re Sabban), 600 F.3d 1219, 1221 (9th Cir. 2010); Britton v. Price (In re Britton), 950 F.2d 602, 604 (9th Cir. 1991).

A debtor's silence or omission of a material fact can constitute a false representation that is actionable under § 523(a)(2)(A). Citibank (South Dakota), N.A. v. Eashai (In re Eashai), 87 F.3d 1082, 1088-89 (9th Cir. 1996). However, in order to find liability for fraud based upon omission or silence, there must also be a duty to disclose. Id.

In this appeal, Cote challenges the bankruptcy court's factual findings supporting its determination of nondischargeability under § 523(a)(2)(A).[15] He argues that the bankruptcy court's own math reveals its error in finding that Cote had insufficient funds and that the evidence supports neither a determination that Cote intended to deceive Contractor nor a determination that Contractor justifiably relied on the existence of $3.8 million in construction financing.

This was essentially a fraudulent inducement or fraud at contract initiation case. Accordingly, a finding of fraud was appropriate only if Cote knew that he could not pay Contractor as required under the Construction Contract at its formation;

---

[15] Cote also challenges the § 523(a)(2)(A) nondischargeability determination on the grounds that his alleged misrepresentation was an oral "statement respecting the debtor's or an insider's financial condition," which is specifically not excepted from discharge. We disagree entirely. Assuming Cote adequately preserved the issue, which the bankruptcy court failed to address in its written decision, because we reverse on other grounds, we need not further address this argument.

among other things, this would require that Cote knew that the Contractor would not complete the project as agreed upon, but instead would come in significantly over budget and after the target date for completion. There is no such evidence in this record.

While we acknowledge the post-trial deference owed to the bankruptcy court, we conclude that it grounded its determinations on three factual findings that are clearly erroneous. First, it overestimated the amount Cote agreed to pay to Contractor under the Construction Contract in connection with Phase I of the Hanna Square project. Second, it underestimated the funds and sources of funds available to Cote to meet the agreed upon expenses under the Construction Contract. And, third, its award of damages exceeded anything owed under the Construction Contract both as it was initially drafted and even as modified by the change orders.

The trial testimony record is minimal, especially considering the amount of debt Contractor sought to have determined nondischargeable. We defer to the bankruptcy court's credibility assessments as to specific testimony,[16] as we must; but, despite the bankruptcy court's generalized finding that Cote was not a credible witness, we conclude that in critical areas Cote's undisputed testimony, when corroborated by documentary evidence, could not be disregarded.

The documents taken into evidence, many of which involved

---

[16] The bankruptcy court, again, specifically found that Valles was not sophisticated in business; nothing in the record shows otherwise. Contractor built many homes previously but not as a third party general contractor.

no explanatory testimony, were substantial. The bankruptcy court undertook to review the record, and we assume it reviewed all the admitted documents. See Tevis v. Wilke, Fleury, Hoffelt, Gould & Birney, LLP (In re Tevis), 347 B.R. 679, 695 (9th Cir. BAP 2006)("It is the bankruptcy court's responsibility to evaluate the evidence presented . . . [for] [it] has an obligation to consider all of the evidence properly presented and to give it the weight that it deserves."). Based on our review of the record, Contractor failed to establish all the elements of its § 523(a)(2)(A) claim, and, thus, it failed to carry its burden.

**B.    What was the misrepresentation?**

Contractor's complaint alleged that Cote made three distinct misrepresentations; the bankruptcy court found a misrepresentation based on a variation of the third.

### 1.    Alleged false promise to pay

Contractor alleged that Cote induced it to enter into the Construction Contract without any intention of paying. The bankruptcy court did not base its nondischargeability decision on this theory, therefore, we do not address it in detail here.[17]

### 2.    Alleged false representations to the Bank

Contractor also alleged that Cote made misrepresentations to the Bank regarding the agreed upon price under the Construction Contract. The bankruptcy court considered

---

[17]    In any event, Contractor's first theory is inconsistent with the undisputed fact that Cote paid Contractor over $1.7 million prior to default and that Contractor, eventually, received payment of substantially all amounts owed under the Construction Contract other than cost overruns and profit thereon from Cote, Cote's lender, and the bond Cote obtained.

- 18 -

important the difference between the numbers in the (limited and largely incomplete) bank documents in evidence and the Construction Contract cost numbers; but, it did not base its decision on any alleged misrepresentation made to the Bank.[18]

   **3.    False representations regarding the Construction Loan and the sufficiency of funds to pay Contractor**

Contractor alleged that Cote misrepresented[19] that the full $3.8 million of Construction Loan proceeds was available to pay construction costs and that he failed to disclose that approximately $1 million of the proceeds was to be used to pay off existing liens on the property.  It, thus, asserted a claim of omission in the face of duty to disclose.  Contractor also implicitly argued that the lesser amount available under the Construction Loan proved that Cote had insufficient funding to pay Contractor the full price agreed to under the Construction Contract.  The bankruptcy court did not entirely reject this argument; instead, it found fraud on a slightly different basis.

The bankruptcy court found that Cote misrepresented the amount of funds at his disposal to complete the project.  In connection with this finding, the bankruptcy court correctly found that only a maximum of approximately $2.6 million was available from the $3.8 million Construction Loan to complete

---

[18]   Nor did the Bank assert a fraud claim against Cote.

[19]   At trial, Valles provided no details as to when, where, or what Cote actually said to allegedly make Valles believe that the Construction Loan did not require loan fees, loan and title costs, interest reserves, or other common financing costs.

Phase I of the project.[20] It found, in effect, that at the time of the Construction Contract, Cote knowingly misrepresented that he had sufficient funds to pay Contractor the amounts owed pursuant to the Construction Contract. The bankruptcy court reasoned that if Cote "had sufficient funding, he would have paid [Contractor]." Order After Trial at 13. The record does not support this finding.

**C.    The record does not support a finding that Cote knowingly misrepresented that he had sufficient funds to pay Contractor**

**1.    The bankruptcy court underestimated Cote's sources of funding at the time of contract formation**

**a)    The Construction Loan proceeds**

The bankruptcy court commenced its analysis of the sufficiency of funds by deducting the payoffs of existing secured debt ($1,147,199) from the $3.8 million loan amount. The difference, approximately $2.6 million, is supported by Cote's trial exhibit, an estimated closing statement from Alliance Title Company, "Est. Undisbursed Funds," which shows $2,604,463 ("Net Loan Proceeds") remained after the payoffs and all costs and charges for the loan.

---

[20]    The bankruptcy court also found that Cote told the Bank that the project would cost a maximum of $2,041,636.55. We question this finding; there was no express testimony in this regard, and the Bank obtained an assignment of the Construction Contract. The bankruptcy court's finding was based on its review of the Disbursement Request. A representative of the Bank's construction auditor testified that this document was a progress disbursement request; Valles had no personal knowledge of who prepared the document that he received in discovery; and Cote testified he did not think it was the budget he submitted to the Bank. No one testified from the Bank at trial. And the loan officer involved is now deceased.

But, rather than analyzing whether the Net Loan Proceeds were sufficient to pay the Construction Contract at the time of formation, the bankruptcy court instead analyzed whether a cost allocation totaling $2,014,636 (roughly identified in the Disbursement Request) was sufficient to pay the Construction Contract. It never further considered whether Cote intended that any of the approximate $500,000 of loan proceeds ($2.6 million less $2.014 million) cover any portion of the costs incurred for Contractor's services under the Construction Contract. This failure was not harmless. There is no evidence in the record from which the bankruptcy court could logically or plausibly infer that the approximately $500,000 ("Excess Loan Proceeds"), or some part thereof, was not available for payment to Contractor.[21]

Obviously, there is a mathematical problem with the bankruptcy court's summary conclusion in regard to the Net Loan Proceeds. The maximum under roof cost of Phase I, $1,929,585, plus the maximum site improvement cost for both Phase I and Phase II, $589,930, is only $2,519,515 — an amount less than the Net Loan Proceeds. And, there is no evidence in the record that supports the bankruptcy court's finding that Cote knew the Phase I site improvements would be more than the Bank's budgeted amount of $426,768. On a facial review, the Net Loan Proceeds were sufficient for payment of the maximum obligations under the Construction Contract reasonably assumed to be payable at the

---

[21] At trial Cote testified that the loan contained amounts for retainage and contingencies, among other costs.

time of its signing: $2,356,353;[22] indeed, there was approximately $250,000 in Construction Loan proceeds in excess of this amount.

The bankruptcy court reached a different conclusion by focusing on the undisputed facts that: (1) the limited bank loan documents in evidence used $101.06 per square foot (and not $120.75) as the cost of construction for the homes in Phase I (totaling $1,614,868) and $426,768, not the bankruptcy court's erroneously identified $556,461, as the site improvement number. The bankruptcy court then concluded, in the face of contrary, undisputed evidence, that only $2,041,636.55 was available for payment of Construction Contract expenses and that Cote knew it. These findings were clearly erroneous.

The record is at odds with a conclusion that all Excess Loan Proceeds were available for construction. The Construction Loan documentation, incomplete as it is, indicates that, as is not uncommon with construction loans, there were interest reserves built into the anticipated uses of funds. The evidence in the record references an interest reserve and interest paid from the initiation of the Construction Loan of $63,850.65. Although the record is less than precise, nothing suggests that Cote reasonably anticipated or should have reasonably anticipated that interest reserves would exhaust the Excess Loan Proceeds. Indeed, as Cote's stated goal was completion of Phase I and sale of the homes by January 1, 2008, this would have been close to the maximum in interest carry reasonably

---

[22]  $1,929,585 + $426,768 = $2,356,353.

anticipated at loan initiation.

The Construction Contract also provided that Cote was responsible for costs related to certain components of Phase I, including the solar arrays. Cote apparently paid some of these expenses from Construction Loan proceeds. This payment was appropriate; Phase I could not be completed without such advances, but they were draws against the $2.6 million that further reduced its availability to Contractor.

Cote testified, however, there was also a contingency budget built into the Construction Loan. The bankruptcy court never addressed this testimony, notwithstanding that the limited loan documents in the record evidence that a contingency line item existed and was utilized. Based on the documentary evidence in the record, the bankruptcy court's limited view of the amount of Construction Loan proceeds available to pay costs under the Construction Contract was clearly erroneous.

The record, instead, supports that as of the formation of the Construction Contract, Cote had access to sufficient funds or significant funds to cover the known costs reasonably anticipated to be incurred under the Construction Contract in Phase I from Construction Loan proceeds. The bankruptcy court's disregard of the Net Loan Proceeds as a source of payment is clear error.

**b)  The additional $155,000 line of credit**

In addition to the $3.8 million in Construction Loan proceeds, Cote testified that he had a separate line of credit. The record supports his testimony and there was no contrary evidence. The bankruptcy court never addressed this source of

- 23 -

funding. On this record, its failure to consider these funds as a source of repayment was not harmless error.

### c) The bond for site costs

Cote also obtained a bond for site costs.[23] Of the $426,768 in budgeted site costs, Contractor's trial exhibit reflects the amount of bonded site costs as $358,014.[24]

The bankruptcy court never considered this insurance of funding in its analysis. Contractor presented no evidence that it was at risk for nonpayment for bonded site improvements despite the fact that payment was substantially assured via the bond obtained by Cote; indeed, the only evidence was that it received post-default payment from the bond. The bankruptcy court's failure to consider this evidence is not harmless error.

### d) Deferred funding: $39,500 contract provision

At trial the parties disagreed on the meaning and import of

---

[23] A recital in the Settlement Agreement states that American Contractors Indemnity Company, as surety for Cote, "issued certain performance and labor and materials bonds in connection with the project, including without limitation, Subdivision Public Improvement Payment Bond No. 1000756422 in the amount of . . . ($393,816.00), dated of (sic) July 10 2007 (the "Bond"). It appears that the Bond likely covered both Phase I and II, as "Project" is defined in the Settlement Agreement to include all phases of Hanna Square, and the amount of the Bond is higher than the amount set forth in the Disbursement Request for Phase I only. Contractor's reference to "project" and "Project" in its various pleadings inconsistently varied as to whether it was referring to one or both phases of Hanna Square. And at trial, Contractor's counsel attempted to impeach Cote by reading Cote's deposition testimony taken in the state court action wherein he stated that he knew the Bank did not lend enough to complete the entire project. Read in context, Cote was referring to the undisputed fact that the Bank made its loan only for Phase I of Hanna Square except as to certain bonded site improvements.

[24] Bonds generally provide a separate source of payment of site costs in the event funding is unavailable and are frequently required by construction lenders.

the provision in the Construction Contract for Contractor's deferral of payment for up to $39,500 per home until the close of escrow on the homes. Cote testified that he relied on this provision as a source for payment of costs up to $395,000 to the extent Contractor's costs exceeded the amount provided by the Bank under its progress payment process. Again, there was no evidence presented establishing that it was unreasonable for Cote to believe, when he singed the Construction Contract, that home sales would be sufficient to pay Contractor in full.

The bankruptcy court, with no discussion or analysis, found that this contract provision applied only if the Contractor "required" the changes that resulted in the overages. As shown in Contractor's February 2008 invoice, Contractor requested judgment for costs and profits thereon that were incurred in excess of the maximum amount reasonably viewed as payable under the Construction Contract. This overage equals $447,879 - 19% over the maximum price agreed upon by the parties in the Construction Contract. Even under Contractor's and the bankruptcy court's interpretation of the $39,500 provision, Contractor agreed to defer receipt of payment of $395,000 of this amount until close of escrow on the homes. Close of escrow never occurred.

Thus, the bankruptcy court's finding that the $39,500 provision applied to none of the amounts for which Contractor sought payment is clearly erroneous. This error is not harmless, as the record supports Cote's testimony that he thought that if problems arose he had up to $395,000 with which to complete construction of the project based upon Contractor's

agreement to defer payment on such required amounts until close of escrow. The only evidence in the record is that at the time the loan was made and the Construction Contract was executed, the Bank valued the Hanna Square project at $12 million, which left it with a healthy loan to value ration of 31%.

### e) Other funding sources

The record is thin on this point, but there is evidence of payments from sources other than the Bank's loan proceeds. The bankruptcy court also ignored this documentary evidence.

In sum, the record shows that Cote had funding sources that the bankruptcy court did not consider.

### 2. The bankruptcy court overestimated the reasonably assumed site costs for Phase I

It is undisputed that Cote agreed to pay Contractor a total of $589,930 for all site improvement (non-building) costs for Phases I and II together. But, nothing in the record shows what amount, if any, the parties agreed to for the Phase I site costs. The only admitted evidence for Phase I site costs consisted of the site cost number reflected in the Disbursement Request, $426,748. Therefore, the bankruptcy court erred when it assigned $556,461, the amount in the Initial Contract for both phases, to the Phase I site costs; there is no support in the record for this determination. This error was not harmless.

### 3. The bankruptcy court's determination of falsity, thus, was based improperly on findings that were clearly erroneous

The errors detailed above led the bankruptcy court to the conclusion of material falsity through statement, omission, or

action. Its determination was clearly erroneous. The record is clear that Cote had sources of payment not acknowledged by the bankruptcy court. Further, the record makes clear that the bankruptcy court erroneously inflated the maximum amount due under the Construction Contract at its initiation by including overstated site improvement costs and erroneously concluded that Cote knew that he lacked sufficient funds.

Contractor argues on appeal that Cote should have known that the project would go over budget, because all projects go over budget. We disagree. Contractor presented neither evidence supporting its argument that all projects go over budget nor evidence that Cote knew Contractor would go over budget. Rather, the record shows that Cote built in monetary incentives to try to encourage quick construction and cost savings efforts - to bring the project in early and below budget. The record also shows that the amounts in the Construction Contract were maximums and that Contractor was obligated to provide reductions upon certain circumstances. There is nothing in the Construction Contract that allowed Contractor to charge anything in excess of the amounts set forth therein.

**D.     The record does not support the bankruptcy court's determination of proximate cause and justifiable reliance**

The bankruptcy court found that Contractor sustained damages, although it did not articulate whether the damages were the proximate result of the misrepresentation on which it based its § 523(a)(2)(A) judgment. It awarded the damages as calculated by Contractor in its final February 2008 invoice,

- 27 -

subtracted the $535,000 settlement amount received and awarded Contractor $490,883.85.

On this record, the bankruptcy court clearly erred in implicitly determining that pre-Construction Contract statement or omission proximately caused the damages that it ultimately awarded. Contractor received payment of all but $47,353 of the maximum under roof cost in the Construction Contract, plus 100% of the site improvement costs included in the Bank's budget. The vast majority of the damages awarded by the bankruptcy court, thus, were amounts that resulted from cost overruns beyond the scope of the Construction Contract.

There is no evidence in the record that Cote ever agreed to pay all these requested cost overruns as he executed only $175,000 in change orders. Again, Contractor agreed in the Construction Contract to build the Phase I homes and related site improvements for a maximum amount. It thus requested – and received – damages greater than either the original contract amount or the increased contract amount given the limited change orders. The damages awarded by the bankruptcy court exceed those available even under a breach of contract theory.

In sum, it was illogical and implausible for the bankruptcy court to find that Contractor was proximately damaged by being induced to enter into a contract under which Contractor received payment of almost all but the amounts that exceeded the contractual maximums.

The bankruptcy court also found that Valles and, thus, Contractor relied on Cote's representation about the sufficiency of funds at Cote's disposal. Valles testified that Cote told

him he had a $3.8 million loan; as stated, this was true.

Contractor, however, presented no evidence that the full $3.8 million amount was necessary to pay Contractor. Both Valles and Frietas testified that when Cote changed the rate of compensation to $115, they insisted it be revised to $120.75. The bankruptcy court did not find Cote believable when he testified that he only agreed to the increase because he was in a hurry to close the loan even though Valles and Frietas were taking advantage of him.[25] We do not question this finding, but note that the difference between the two amounts is $5.75 per square foot, a total of $91,885. Based on Contractor's alleged damages, the insufficiency of funds issue cannot turn on this rate differential.

The bankruptcy court did not find that Contractor's reliance was justifiable, although, again, it found that Valles "did not appear to be particularly sophisticated in business transactions." Order Following Trial at 9.

**E.    The record does not support unequivocally the bankruptcy court's inference that Cote intended to deceive Contractor**

The bankruptcy court found that Cote's intent to deceive Contractor was clear. The record does not support its finding unequivocally.

The bankruptcy court relied on Valles' testimony that he was kept in the dark on the loan and construction funding process and that he had restricted access to both the Bank and

---

[25] Although the bankruptcy court made a general finding that Cote was not a credible witness, this was the only testimony that the bankruptcy court specifically identified as not credible.

its auditor. The record, however, was inconsistent on these points.

The bankruptcy court appears implicitly to have concluded that Cote intentionally did not provide Valles any bank documents. But the record is devoid of any testimony to this effect and, in fact, is inconsistent with Valles' execution of the Contract Assignment wherein he acknowledged and accepted the disbursement provisions in the Bank's loan documents. Further, at trial, Valles testified that Cote provided him other documentation regarding the funding for the project, although Valles did not recall any other specific documents.[26] Thus, the record is unclear as to what loan documentation Valles reviewed.

Valles also testified that he was prevented from contacting the Bank's auditor, but this testimony is inconsistent with testimony by Contractor's project manager and agent, Frietas. Frietas testified that with each invoice submitted by Contractor, Frietas walked the project with the Bank's auditor and discussed billings and percentage completion. The bankruptcy court found both Valles and Frietas to be credible witnesses. It, however, failed to address or reconcile the inconsistencies in their testimony.

The bankruptcy court also found the method of disbursing loan proceeds, the requirement that Contractor acknowledge assignment of the Construction Contract, the fact that the Bank

---

[26] The Contract Assignment was the only bank loan document admitted in its entirely into evidence. Contractor's exhibit list included a document titled "United American Bank Loan Agreement (Loan #171571)" as exhibit 30, but it, along with documents numbered 31 through 44, was crossed off the list and never discussed or offered at trial.

dealt exclusively with Cote, and other aspects of the lending process supported its determination of intent to defraud. We note that there was no expert testimony or secondary sources discussing construction lending introduced into evidence at trial. Nor was there any testimony that Cote, as opposed to the Bank, dictated the terms of the construction loan and decided how to disburse loan proceeds; one would logically assume that the Bank would make these decisions. The only testimony suggesting concern on these points was from Valles, who, as previously discussed, was found to be unsophisticated in business.

Finally, the bankruptcy court found evidence of intent to defraud from what it described as alterations Cote made to the amounts requested by Contractor when he sought payments from the Bank. Nothing in the record, however, shows that Cote made any such alterations. The record evidences that he requested payment consistent with Contractor's requests, but also sought advances on account of other project costs not covered under the Construction Contract, such as $157,400 for solar arrays and $100,000 for insurance. The Construction Contract made clear that Cote was responsible for these portions of the Phase I construction; nothing in the agreements prohibited him from using some of the Construction Loan proceeds to pay these required costs. Again, there was neither testimony nor evidence presented establishing that this use was inconsistent with the discussions of the parties prior to execution of the Construction Contract or at any point in time.

**CONCLUSION**

Based on the foregoing, we REVERSE.